UNITED STATES of America, Plaintiff–Appellee,

v.

Javier VASQUEZ–VELASCO, Defendant–Appellant.

No. 91–50342.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 1, 1993.

Decided Jan. 25, 1994.

Gregory Nicolaysen, Federal Litigation Group, Inc., Beverly Hills, California, for the defendant-appellant.

John L. Carlton, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Before: FLETCHER, PREGERSON and NORRIS, Circuit Judges.

FLETCHER, Circuit Judge:

Javier Vasquez–Velasco was convicted in a jury trial of committing violent crimes in aid of a racketeering enterprise in violation of 18 U.S.C. § 1959. Vasquez–Velasco appeals the district court's denial of his motion to dismiss for lack of subject matter jurisdiction. He also argues that his trial was improperly joined, and appeals the district court's denial of his motions for severance. Finally, he appeals the district court's imposition of a sentence greater than ten years in the absence of a special verdict. We affirm.

## BACKGROUND

Vasquez–Velasco's appeal arises out of the second trial associated with the 1985 kidnapping and murders of Enrique Camarena, an American agent with the Drug Enforcement Agency ("DEA"), and Alfredo Zavala, a DEA informant.[1] The government's theory at trial was that Vasquez–Velasco and his three co-defendants all acted to commit violent crimes to further their positions in the "Guadalajara Narcotics Cartel," a drug trafficking enterprise based in Guadalajara. The cartel began distributing large amounts of drugs into the United States in the early 1980's. According to the government, in 1984 and 1985 American DEA enforcement activities resulted in losses to the cartel totalling billions of

---

1. The first trial resulted in several appeals to this circuit court. *See United States v. Lopez–Alvarez,* 970 F.2d 583 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 504, 121 L.Ed.2d 440 (1992); *United States v. Felix–Gutierrez,* 940 F.2d 1200 (9th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 2332, 124 L.Ed.2d 244 (1993); *United States v. Verdugo–Urquidez,* 939 F.2d 1341 (9th Cir.1991), *vacated,* —— U.S. ——, 112 S.Ct. 2986, 120 L.Ed.2d 864 (1992).

dollars. As a result of these losses, the cartel engaged in a series of retaliatory actions against DEA agents in Mexico. The murders with which Vasquez–Velasco and his codefendants were charged were part of these retaliatory activities.

The circumstances underlying this trial occurred in January and February, 1985. At that time, an American citizen named John Walker was living in Guadalajara, Mexico and writing a novel. In December 1984, Alberto Radelat, a legal resident alien in the United States, travelled to Guadalajara to visit his friend Walker. Radelat was a photographer. Neither Walker nor Radelat had any apparent association with the DEA or with any drug-related activities.

On the night of January 30, 1985, members of the "Guadalajara Narcotics Cartel" gathered at a Guadalajara restaurant known as "La Langosta." The cartel members at this gathering included Rafael Caro–Quintero, Ernesto Fonseca–Carillo, and Javier Barba–Hernandez, all well-known drug dealers in Guadalajara, the appellant Vasquez–Velasco, and other members of the cartel.

That night Walker and Radelat went to the La Langosta restaurant at approximately 7:00 p.m. Soon after they entered, they were grabbed by ten to fifteen members of the cartel and beaten with fists and guns. They were subsequently carried to a storage room in the back of the restaurant while the beating continued. Vasquez–Velasco assisted in carrying and beating the two men. The two men were tortured until one of them admitted that they were police. Both were later killed in a field outside of Guadalajara. The next day Vasquez–Velasco informed Barba–Hernandez that both tourists had died. In June 1985, the bodies of Walker and Radelat were found in Primavera Park outside of Guadalajara.

2. The indictment charged seven other persons under § 1959 with participating in violent crimes related to the murders of Walker and Radelat, but none of these other individuals were codefendants at Vasquez–Velasco's trial. Three individuals named in Counts One and Two were also named in the counts related to the murders of Camarena and Zavala.

3. Section 1959 provides:

A grand jury returned a Sixth Superseding Indictment charging nineteen persons associated with the cartel with various crimes performed in 1984 and 1985. Counts One and Two of the indictment charged Vasquez–Velasco with committing violent crimes in aid of a racketeering enterprise in violation of 18 U.S.C. § 1959. Specifically, the indictment alleged that Vasquez–Velasco, as a member of the cartel, participated in the murders of Walker and Radelat for the purpose of maintaining and increasing his position in the drug trafficking activities of the cartel.

Vasquez–Velasco was tried with three codefendants: Juan Ramon Matta–Ballesteros, Ruben Zuno–Arce, and Juan Jose Bernabe–Ramirez. His codefendants were charged in Counts Three through Eight of the Indictment with violent acts related to the kidnapping and murder of Camarena and Zavala, but not with the murders of Walker or Radelat.[2] Vasquez–Velasco was not charged with participating in the murders of Camarena and Zavala.

Vasquez–Velasco was convicted under both counts on August 6, 1990. On May 23, 1991 he was sentenced to two consecutive terms of life imprisonment. He timely appealed to this court.

The district court exercised its jurisdiction under 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## DISCUSSION

I. *Extraterritorial application of 18 U.S.C. § 1959*

Vasquez–Velasco raises four issues on appeal. First, he argues that the district court erred in ruling that § 1959 applies extraterritorially.[3] We review de novo a dis-

(a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in

trict court's assumption of jurisdiction. *United States v. Peralta*, 941 F.2d 1003, 1010 (9th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1484, 117 L.Ed.2d 626 (1992); *United States v. Layton*, 855 F.2d 1388, 1394 (9th Cir.1988), *cert. denied*, 489 U.S. 1046, 109 S.Ct. 1178, 103 L.Ed.2d 244 (1989).

## A. *Extraterritoriality*

■ "Generally there is no constitutional bar to the extraterritorial application of United States penal laws." *United States v. Felix–Gutierrez*, 940 F.2d 1200, 1204 (9th Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 2332, 124 L.Ed.2d 244 (1993); *Chua Han Mow v. United States*, 730 F.2d 1308, 1311 (9th Cir.1984), *cert. denied*, 470 U.S. 1031, 105 S.Ct. 1403, 84 L.Ed.2d 790 (1985). To determine whether a given statute should have extraterritorial application in a specific case, courts look to congressional intent. *United States v. Bowman*, 260 U.S. 94, 98, 43 S.Ct. 39, 40, 67 L.Ed. 149 (1922); *Felix–Gutierrez*, 940 F.2d at 1204; *Chua Han Mow*, 730 F.2d at 1311. When faced with a criminal statute such as § 1959, we may infer that extraterritorial application is appropriate from "'the nature of the offenses and Congress' other legislative efforts to eliminate the type of crime involved.'" *Felix–Gutierrez*, 940 F.2d at 1204 (quoting *United States v. Thomas*, 893 F.2d 1066, 1068 (9th Cir.), *cert. denied*, 498 U.S. 826, 111 S.Ct. 80, 112 L.Ed.2d 53 (1990) (quotations omitted)). Where "[t]he *locus* of the conduct is not relevant to the end sought by the enactment" of the statute, and the statute prohibits conduct that obstructs the functioning of the United States government, it is reasonable to infer congressional intent to reach crimes committed abroad. *United States v. Cotten*, 471 F.2d 744, 751 (9th Cir.), *cert. denied*, 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 396 (1973) (statute that proscribes theft of government property is not logically dependent on the locality of violation for jurisdiction) (emphasis in original); *see also Felix–Gutierrez*, 940 F.2d at 1204.[4]

■ In determining whether a statute applies extraterritorially, we also presume that Congress does not intend to violate principles of international law. Thus, in the absence of an explicit Congressional directive, courts do not give extraterritorial effect to any statute that violates principles of international law. *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21–22, 83 S.Ct. 671, 677–678, 9 L.Ed.2d 547 (1963) (quoting *The Charming Betsy*, 2 Cranch 64, 118, 2 L.Ed. 208 (1804) (court will not construe statute to apply extraterritorially where application of National Labor Rela-

---

violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished—
 (1) for murder or kidnaping, by imprisonment for any term of years or for life or a fine of not more than $50,000, or both; ...
 (5) for attempting or conspiring to commit murder or kidnaping, by imprisonment for not more than ten years or a fine of not more than $10,000 or both....
18 U.S.C. § 1959.

4. Because jurisdiction is ordinarily exercised on the basis of territorial boundaries, we generally presume that Congress intended the legislation to apply only within the territorial boundaries of the United States absent statutory language or an express statement by Congress to the contrary. Restatement (Third) of Foreign Relations Law of the United States § 402 cmt. a (1987); *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949). However, this presumption does not apply to all criminal statutes. In *United States v. Bowman*, 260 U.S. 94, 98, 43 S.Ct. 39, 41, 67 L.Ed. 149 (1922), the Supreme Court stated that "the same rule of

interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated...." *See also Felix–Gutierrez*, 940 F.2d at 1205 n. 3. Limiting the jurisdiction of drug smuggling statutes to activities that occur within the United States would severely undermine their scope and effective operation because "drug 'smuggling by its very nature involves foreign countries, and ... the accomplishment of the crime always requires some action in a foreign country.'" *Felix–Gutierrez*, 940 F.2d at 1204 (citing *Brulay v. United States*, 383 F.2d 345, 350 (9th Cir.), *cert. denied*, 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478 (1967)).

 In the present case § 1959 was applied to violent activities performed overseas to further a drug trafficking enterprise. This application of § 1959 therefore falls within the category of cases described by *Bowman* and *Felix–Gutierrez* for which we do not require an affirmative statement of congressional intent in order to find that the statute applies extraterritorially.

tions Act to protect foreign seapersons on foreign ships would violate both a Treaty with Honduras and established principles of international law)); *Weinberger v. Rossi,* 456 U.S. 25, 32, 102 S.Ct. 1510, 1515, 71 L.Ed.2d 715 (1982) (interpreting statute that prohibits employment discrimination against United States citizens on military bases overseas unless permitted by "treaty" in manner that is consistent with international executive agreements and not just treaties entered into pursuant to Article II of the Constitution); Restatement (Third) of Foreign Relations Law of the United States § 114 (1987) [hereinafter "Restatement"] ("[w]here fairly possible, a United States statute is to be construed so as not to conflict with international law").

In general, international law recognizes several principles whereby the exercise of extraterritorial jurisdiction may be appropriate. These principles include the objective territorial principle, under which jurisdiction is asserted over acts performed outside the United States that produce detrimental effects within the United States, and the protective principle, under which jurisdiction is asserted over foreigners for an act committed outside the United States that may impinge on the territorial integrity, se-

curity, or political independence of the United States.[5] *See, e.g., Felix–Gutierrez,* 940 F.2d at 1205–06; *Chua Han Mow,* 730 F.2d at 1311–12 (citations omitted); *United States v. King,* 552 F.2d 833, 851–52 (9th Cir.1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977); Restatement § 402. Nevertheless, an exercise of jurisdiction on one of these bases still violates international principles if it is "unreasonable".[6] Restatement § 403 cmt. a (stating that "[t]he principle that an exercise of jurisdiction on one of the bases indicated ... is nonetheless unlawful if it is unreasonable ... has emerged as a principle of international law").

Our circuit has applied this analysis to find that the extraterritorial application of the precursor to § 1959 in circumstances similar to those presented by this case is consistent with Congressional intent. In *Felix–Gutierrez,* the defendant was charged as an accessory after the fact to the commission of a violent crime, the kidnapping and murder of Enrique Camarena, in aid of a racketeering enterprise. The defendant was charged under 18 U.S.C. § 1952B, the predecessor to § 1959. *See United States v. Lopez–Alvarez,* 970 F.2d 583, 586, 596 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 504, 121 L.Ed.2d 440 (1992). We held that because drug trafficking by its nature involves for-

---

**5.** The other recognized bases of jurisdiction to prescribe are (1) territorial, under which jurisdiction is based on the place where the offense is committed; (2) national, under which jurisdiction is based on the nationality or national character of the offender; (3) universal, under which jurisdiction is appropriate for crimes so heinous that any nation with control over the Supreme Court may assert jurisdiction; and (4) passive personality, under which jurisdiction is based on the nationality of the victim. *Id.* Territoriality and nationality are the universally recognized bases for the exercise of extraterritorial jurisdiction. Restatement § 402 cmt. a.

**6.** The Third Restatement identifies a non-exhaustive list of factors that may be relevant to a determination of reasonableness:

... (2) Whether exercise of jurisdiction over a person or activity is unreasonable is determined by evaluating all relevant factors, including, where appropriate:

(a) the link of the activity to the territory of the regulating state, *i.e.,* the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;

(b) the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;

(c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;

(d) the existence of justified expectations that might be protected or hurt by the regulation;

(e) the importance of the regulation to the international political, legal, or economic system;

(f) the extent to which the regulation is consistent with the traditions of the international system;

(g) the extent to which another state may have an interest in regulating the activity; and

(h) the likelihood of conflict with regulation by another state.

Restatement § 403(2).

eign countries and because DEA agents often work overseas, the murder of a DEA agent in retaliation for drug enforcement activities is a crime against the United States regardless of where it occurs. Thus, we found that Congress would have intended that § 1959 be applied extraterritorially to cases involving the murder of DEA agents abroad. *Felix–Gutierrez,* 940 F.2d at 1204; *see also, Lopez–Alvarez,* 970 F.2d at 596 (extraterritorial application of § 1952B is appropriate against defendant who participated in abduction of Camarena).

We have also held that extraterritorial application of a statute such as § 1959 to the murder of a DEA agent is consistent with principles of international law, particularly the objective territorial and the protective principles. Our circuit has repeatedly approved extraterritorial application of statutes that prohibit the importation and distribution of controlled substances in the United States because these activities implicate national security interests and create a detrimental effect in the United States. *Chua Han Mow,* 730 F.2d at 1312; *see also King,* 552 F.2d at 851–52. In *Felix–Gutierrez,* we applied the principle to hold that by acting to prevent the United States from apprehending the murderer of DEA agent Enrique Camarena, the appellants had adversely affected our country's national security interest in eliminating the flow of illegal drugs into the United States. 940 F.2d at 1206.

■ Finally, we are convinced that extraterritorial application of § 1959 to violent crimes associated with drug trafficking is reasonable under international law principles. Because drug smuggling is a serious and universally condemned offense, no conflict is likely to be created by extraterritorial regulation of drug traffickers. *See* Restatement § 403, Rptr. n. 8 (1987).

■ Although the violent crime in which Vasquez–Velasco participated was the murder of an American citizen, and not the murder of a DEA agent, extraterritorial application of § 1959 is still appropriate in this case. According to the government's theory, the cartel members mistook Walker and Radelat for DEA agents and killed them in retaliation for the losses inflicted on the cartel by the DEA. As in *Felix–Gutierrez,* the violent crime was directed against the United States as a response to its enforcement efforts in Mexico. The murders of Walker and Radelat, like the murder of agent Camarena, were performed to further the cartel's drug smuggling activities by intimidating the DEA from continuing its enforcement activities against the cartel's drug trafficking. Such actions could also intimidate local police and drug agencies, thereby inhibiting them from cooperating with the DEA. In this context, the murder of American citizens has an equally direct and adverse impact on our nation's security interest in combatting the importation and trafficking of illegal narcotics.

### B. *Sufficiency of the evidence*

■ Vasquez–Velasco argues that even if § 1959 may be applied extraterritorially if the murders were committed with the purpose of retaliating against the DEA, in this case there is insufficient evidence to establish such a nexus between the murder of the two American tourists and the DEA's activities in Mexico.

■ If the evidence at trial only suggested that two tourists were randomly murdered, extraterritorial application of § 1959 would be inappropriate. We therefore must decide whether there is sufficient evidence in the record to indicate that the murders of Walker and Radelat were in fact performed with the intention of adversely affecting DEA activities and thus of promoting the cartel's drug trafficking activities.[7]

---

**7.** Extraterritorial application of § 1959 to the random murder of tourists abroad would be inappropriate because such extraterritorial application would rely completely on the fact that an American citizen was murdered. Thus, extraterritoriality would be based solely on the passive personality principle, under which jurisdiction is asserted based on the nationality of the victim. In general, this principle has not been accepted as a sufficient basis for extraterritorial jurisdiction for ordinary torts and crimes. *See* Restatement § 402 cmt. g; *see also* Restatement (Second) of Foreign Relations Law of the United States § 30(2) (1965) (stating that "[a] state does not have jurisdiction to prescribe a rule of law attaching legal consequences to conduct of an alien outside its territory merely on the ground that the conduct affects one of its nationals").

In considering the evidence, it is helpful to remember that Vasquez–Velasco was charged with committing a violent crime in aid of a racketeering enterprise. In order to convict Vasquez–Velasco of this crime, the government was required to prove (1) that the Guadalajara Narcotics Cartel exists; (2) that the cartel is a racketeering enterprise engaged in drug smuggling; (3) that Vasquez–Velasco participated in the murders of Walker and Radelat; and (4) that Vasquez–Velasco acted for the purpose of promoting his position in the cartel. *See* 18 U.S.C. § 1959. Given the facts that the government was required to establish at trial to prove the elements of the crime charged, we find it appropriate to consider both the direct testimony as to Vasquez–Velasco's participation in the murders and the broader circumstantial evidence of the events that occurred around the time of the murders.

When viewed in its entirety, the record clearly supports the government's contention that Walker and Radelat were murdered in retaliation for the DEA's activities in Mexico. At trial, the government presented evidence that the Guadalajara Narcotics Cartel became a powerful drug trafficking organization in the early 1980's. By 1983 and 1984, large amounts of cocaine were being distributed by members of the cartel in the United States, and the cartel controlled extensive marijuana fields in Mexico. In 1984 and 1985, the cartel suffered from losses amounting to billions of dollars as a result of investigations by American authorities. For example, in May 1984, as a result of American inspections, the Mexican authorities raided several marijuana ranches in the Zacatecas area, destroying over ten tons of processed marijuana, hashish oil and marijuana seeds. In June 1984, several million dollars worth of cocaine proceeds were seized in a California hotel. And in November, over 10,000 tons of marijuana worth approximately $5 billion were destroyed in raids in Chihuahua.

As a result of these raids, the cartel engaged in a series of retaliatory actions against DEA agents in Mexico and against people suspected of cooperating with the DEA. For example, in September 1984, a Mexican lawyer named Cesar Garciabueno who had provided information to the DEA was shot in a bar by an individual who claimed to work for Felix–Gallardo, a leader in the cartel. The assailant allegedly stated, "You're going to die because you're a snitch." Moreover, throughout 1984 Felix–Gallardo became aware he was being investigated by the DEA and sent a warning to the DEA not to investigate him. On several subsequent occasions, agents who were following Felix–Gallardo were chased by armed men.

In September of 1984, cartel leaders met at the home of Barba–Hernandez, another cartel leader, where they agreed that the DEA agent responsible for their trouble should be "picked up". In subsequent meetings during 1984 and 1985, the agent was identified as Enrique Camarena, and it was again agreed that he should be picked up to find out how much he knew.

In the midst of these events, in February 1985, Walker and Radelat walked into a restaurant known by the DEA to be frequented by drug traffickers. They were carried to the back of the restaurant and beaten by members of the cartel. At trial, one cartel member testified that his boss Barba–Hernandez in describing the event told him that "some gringos had been spying on them at the restaurant" and that one had been killed. (RT 5/24/90, at 33–34). He further testified that Vasquez–Velasco's nephew told him that "some damn gringoes—they had caught them spying, and that they had beaten the shit out of them." (RT 5/24/90, at 35). Also at trial, a DEA agent named Reynoso testified that Vasquez–Velasco claimed to have been informed by his brother that the two

More recently, the passive personality principle has become increasingly accepted as an appropriate basis for extraterritoriality when applied to terrorist activities and organized attacks on a state's nationals because of the victim's nationality. Restatement § 402, cmt. g. Moreover, the passive personality principle serves as the basis of a recent United States statute directed at acts of terrorism overseas. *See* Omnibus Diplomatic Security and Antiterrorism Act of 1986 § 1202, 18 U.S.C. § 2331. However, a random murder of an American tourist is unlikely to qualify as terrorist activity or an organized attack, indicating that extraterritoriality would be inappropriate even under this standard.

Americans who went to La Langosta that night looked suspicious and were interrogated at the restaurant and were almost pressured into admitting that they were police. (RT 5/30/90 at 200–01). Reynoso further testified that Vasquez–Velasco claimed to have been told that two Americans were tortured and eventually taken to a field near Guadalajara and killed. (SER at 60–61).

One week later, Agent Camarena and his informant Zavala were kidnapped by the cartel. Camarena was tortured and interrogated about the DEA's knowledge about the cartel. The men were murdered and in March 1985 their bodies were found in the state of Michoacan. Forensic evidence established that the bodies had originally been buried in Primavera Park near Guadalajara. In June 1985, the bodies of Walker and Radelat were found in Primavera Park.

Vasquez–Velasco argues that there is insufficient evidence supporting the government's theory because no one at trial specifically testified that Walker and Radelat were murdered because they were mistaken for DEA agents. While Vasquez–Velasco is correct in arguing that no one at trial specifically testified that Walker and Radelat were mistaken for DEA agents, there clearly is sufficient evidence in the record to support this theory. As we have already indicated, at the time the murders took place the cartel was suffering from serious economic setbacks. Cartel members had identified the DEA as responsible for their losses and had already planned to "pick up" agent Camarena. They were aware that they were being followed by DEA agents and had actively threatened some who came too close. In this context, it is wholly reasonable to believe that when fifteen cartel members beat and killed two American tourists who were caught "spying" on them, they did so in the belief that the tourists were DEA agents. The fact that Camarena was captured, tortured and murdered one week later only strengthens the government's case by suggesting a pattern of retaliatory activity by the cartel. In light of the extensive evidence

as to the cartel's knowledge and behavior during the time of the murders, the only logical explanation for the cartel's murders of Walker and Radelat is that supplied by the government. We therefore conclude that there is sufficient evidence in the record to support the extraterritorial application of § 1959 given the facts of this case.

## II. *Joinder*

Vasquez–Velasco contends that the counts brought against his codefendants related to the murders of Camarena and Zavala were improperly joined with the counts brought against him related to the murders of Walker and Radelat.

 A claim of misjoinder of offenses or parties under Federal Rule of Criminal Procedure 8 is a question of law reviewed de novo. *United States v. Sanchez–Lopez,* 879 F.2d 541, 550 (9th Cir.1989). Federal Rule of Criminal Procedure 8(b) governs the standard for joining two or more defendants in the same indictment:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be in each count.

In applying this standard, we look to the phrase "same series of acts or transactions constituting an offense or offenses." The term "transaction" is interpreted flexibly, and whether a "series" exists depends on whether there is a "logical relationship" between the transactions. *Felix–Gutierrez,* 940 F.2d at 1208; *United States v. Ford,* 632 F.2d 1354, 1372 (9th Cir.), *cert. denied,* 450 U.S. 934, 101 S.Ct. 1399, 67 L.Ed.2d 369 (1981).[8] Mere factual similarity between the events is not a sufficient basis for joinder, *Ford,* 632 F.2d at 1372, nor is the mere showing that the events occurred at about

---

8. Vasquez–Velasco argues that the propriety of joinder under Rule 8(b) is to be based only on the face of the indictment. We have held that the plan or conspiracy need not be charged on the face of the indictment; instead, we look to whether the evidence introduced at trial establishes that joinder was appropriate. *Ford,* 632 F.2d at 1372.

the same time or that the acts violated the same statute. *United States v. Satterfield,* 548 F.2d 1341, 1344 (9th Cir.1977). A logical relationship is typically shown "by the existence of a common plan, scheme, or conspiracy." *Felix–Gutierrez,* 940 F.2d at 1208; *Ford,* 632 F.2d at 1372.

We have stated "that Rule 8(b) should be construed broadly in favor of initial joinder." *Ford,* 632 F.2d at 1373; *Satterfield,* 548 F.2d at 1344. The goal of " ' "maximum trial convenience consistent with minimum prejudice" is best served by permitting initial joinder of charges against multiple defendants whenever the common activity constitutes a substantial portion of the proof of the joined charges.' " *Ford,* 632 F.2d at 1372 (quoting *United States v. Roselli,* 432 F.2d 879, 899 (9th Cir.1970), *cert. denied,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971), and 8 Moore's Federal Practice ¶ 8.06[2] at 8–36).

We found joinder to be appropriate in *Felix–Gutierrez,* a case including different defendants but related to the Camarena murder. 940 F.2d at 1208–09. In *Felix–Gutierrez,* appellant Felix–Gutierrez, who did not participate in the kidnapping and murder of DEA Agent Camarena, was indicted as an accessory after the fact to the murder and tried along with two codefendants who did participate in the murder. Felix–Gutierrez, a member of the same "international narcotics enterprise" as his codefendants, was convicted for helping yet another individual, Caro–Quintero, escape to Costa Rica after the murder. *Id.* We found that because evidence of participation in the narcotics enterprise was necessary to prove the offenses charged against each of the three codefendants, the charges involved substantially overlapping evidence. This fact, combined with the fact that the events occurred during a brief time span and included many of the same participants supported joinder of the charges. *Id.* at 1209; *see also United States v. Hoelker,* 765 F.2d 1422, 1425–26 (9th Cir. 1985), *cert. denied,* 475 U.S. 1024, 106 S.Ct. 1219, 89 L.Ed.2d 330 (1986) (joinder appropriate where narcotics charges and extortion charge both arose from the same motive—a need for funds—had the same participants, and proof of which would be significantly overlapping); *Ford,* 632 F.2d at 1372 (joinder proper where trustees' acceptance of potentially lucrative directorships in exchange for surrendering control of trusts, while not the same acts as the establishment of a deferred compensation plan and a pension credit plan, are part of broader scheme to enrich trustees at expense of the trust).

The same analysis applied in *Felix–Gutierrez* applies here. In order to convict Vasquez–Velasco under § 1959, the government was required to prove that the Guadalajara Narcotics Cartel existed, that the cartel was an enterprise engaged in racketeering activity that affected interstate commerce, that Vasquez–Velasco participated in the murders of Walker and Radelat, and that Vasquez–Velasco acted for the purpose of promoting his position in the cartel. *See* 18 U.S.C. § 1959. In order to prove the charges against Vasquez–Velasco's codefendants, the government was also required to prove that the cartel existed, that it engaged in racketeering activities that affected interstate commerce, and that the defendants participated in violent acts to further their positions within the enterprise. Because there was a substantial overlap in the evidence required to prove the existence of the cartel and its racketeering activities, the district court did not err in denying Vasquez–Velasco's motion to sever for misjoinder under Rule 8(b).

### III. *Severance*

Vasquez–Velasco contends that the district court abused its discretion in denying his motions for severance. A district court's decision regarding whether to sever pursuant to Federal Rule of Criminal Procedure 14 is reviewed for an abuse of discretion. *United States v. Cuozzo,* 962 F.2d 945, 949 (9th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 475, 121 L.Ed.2d 381 (1992); *United States v. Unruh,* 855 F.2d 1363, 1374 (9th Cir.1987), *cert. denied,* 488 U.S. 974, 109 S.Ct. 513, 102 L.Ed.2d 548 (1988).

The government first contends that Vasquez–Velasco waived his right to assert this claim on appeal because he failed to renew it at the close of evidence. Alternatively, the government contends that the district court

did not abuse its discretion in denying Vasquez–Velasco's motions to sever.

## A. Waiver of severance motion

 A defendant generally waives a severance motion by failing to renew it at the close of evidence. *Felix–Gutierrez,* 940 F.2d at 1208; *United States v. Smith,* 893 F.2d 1573, 1581 (9th Cir.1990). However, " '[t]his requirement is not an inflexible one; waiver may be absent when the motion accompanies the introduction of evidence deemed prejudicial and a renewal at the close of all evidence would constitute an unnecessary formality.' " *Felix–Gutierrez,* 940 F.2d at 1208 (quoting *United States v. Kaplan,* 554 F.2d 958, 965 (9th Cir.) (per curiam), *cert. denied,* 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977)). "The guiding principle is whether the defendant diligently pursued the motion." [9] *Id.;* *see also U.S. v. Davis,* 932 F.2d at 762 (defendant waives right to appeal denial of severance motion where he fails to renew motion at any time during trial).

 Even though Vasquez–Velasco did not renew his motion to sever at the close of all evidence, he did "diligently pursue" his motion. Vasquez–Velasco made and renewed his motion for severance prior to trial, during trial, and at the conclusion of the government's case. Each request was denied. *See United States v. Plache,* 913 F.2d 1375, 1379 (9th Cir.1990) (stating that one important function of the renewal requirement is that "it enables the trial court to assess more accurately whether joinder is

prejudicial at a time when the evidence is fully developed"); *United States v. Free,* 841 F.2d 321, 324 (9th Cir.1988) (same). Although he did not move for severance at the end of trial, to require Vasquez–Velasco to move for severance on the same grounds for which several of his motions had already been denied would be an "unnecessary formality." *See United States v. Davis,* 932 F.2d at 762 (suggesting that if district court indicates that renewal is fruitless, party does not waive right to appeal by failing to renew motion); *Cuozzo,* 962 F.2d at 949 n. 5 (when codefendant moves for severance and is denied, it may be an " 'unnecessary formality' " for appellant to renew his motion); *Kaplan,* 554 F.2d at 966 (two defendants who do not renew motion to sever at all waive right to appeal, but three defendants who renew motions twice during trial may appeal the issue). We hold that Vasquez–Velasco did not waive his right to appeal the district court's refusal to sever the trial.

## B. Correctness of denial of severance motions

Federal Rule of Criminal Procedure 14 governs the severance of both defendants and charges.[10] Rule 14 recognizes that even when counts are properly joined under Rule 8(b), severance of the counts may be appropriate to avert prejudice to a defendant.

 Rule 14 sets a high standard for a showing of prejudice. The party seeking reversal of the denial of a motion to sever bears the burden of proving such " 'clear,'

---

**9.** At times our circuit has interpreted *Kaplan* quite mechanically as stating either one or two exceptions to the general rule. In *United States v. Plache,* we read *Kaplan* to provide two exceptions: the defendant does not waive his right to appeal by failing to renew his motion at the close of all evidence (1) when he renews his motion at the introduction of the "prejudicial" evidence; *or* (2) if renewal would be a formality. 913 F.2d 1375, 1378–79 (9th Cir.1990). In contrast, in *United States v. Free,* we interpreted *Kaplan* as stating one two-prong exception. 841 F.2d 321, 324–25 (9th Cir.), *cert. denied,* 486 U.S. 1046, 108 S.Ct. 2042, 100 L.Ed.2d 626 (1988); *see also United States v. Davis,* 932 F.2d 752, 762 n. 7 (9th Cir.1991) (noting the confusion but declining to resolve the issue).

In contrast, at other times our circuit has interpreted *Kaplan* more generally to state the ex-

ception as being that " '[t]he guiding principle is whether the defendant diligently pursued the motion.' " *Cuozzo,* 962 F.2d at 949 n. 5 (quoting *Felix–Gutierrez,* 940 F.2d at 965). Because the purpose of the waiver rule is to permit the district court to correct any errors at trial and not to impose meaningless procedural hurdles on defendants, we believe the latter standard is the most appropriate.

**10.** Rule 14 provides in part:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

'manifest,' or 'undue' prejudice from the joint trial, that [it] violates one of his substantive rights, so that the prejudice is of 'such a magnitude that the defendant was denied a fair trial.'" *Felix–Gutierrez,* 940 F.2d at 1209 (quoting *United States v. Conners,* 825 F.2d 1384, 1391 (9th Cir.1987)); *see also Cuozzo,* 962 F.2d at 950.

In assessing whether joinder was prejudicial, of foremost importance is whether the evidence as it relates to the individual defendants is easily compartmentalized. *United States v. Patterson,* 819 F.2d 1495, 1501 (9th Cir.1987); *United States v. De Rosa,* 670 F.2d 889, 898 (9th Cir.), *cert. denied,* 459 U.S. 993, 103 S.Ct. 353, 74 L.Ed.2d 391 (1982). Central to this determination is the trial judge's diligence in instructing the jury on the purpose of the various types of evidence. *See, e.g., Cuozzo,* 962 F.2d at 950; *Ford,* 632 F.2d at 1374 (refusal to sever upheld "[w]here the district judge has instructed the jury as to the admissibility of evidence and the appellants have failed to show an inability on the part of the jury to compartmentalize the evidence as it relates to each defendant"); *United States v. Rasheed,* 663 F.2d 843, 854–55 (9th Cir.1981), *cert. denied,* 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982) (refusal to sever upheld even though evidence against codefendant was much stronger because judge gave proper cautionary instructions to jury and appellants failed to indicate how jury would be unable to compartmentalize the evidence). *Id.* The most common reason for severing a trial is where codefendants present mutually exclusive or irreconcilable defenses. *United States v. Rucker,* 915 F.2d 1511, 1513 (11th Cir.1990) (where two codefendants whose vehicle contained a gun and cocaine each claim ignorance about contraband, jury would be unable to believe testimony of either defendant without disbelieving codefendant's testimony). Severance has been granted when the charges brought against the defendants or the weight of the evidence supporting each charge is wholly disparate or disproportionate. *United States v. Sampol,* 636 F.2d 621, 642–51 (D.C.Cir.1980) (severance required where vast bulk of testimony was about codefendants' assassination charge, where testimony was gruesome, where no curative jury instructions were given, where confusion of charges and evidence was likely, and where defendant was not permitted to cross-examine some witnesses); *United States v. Donaway,* 447 F.2d 940, 943 (9th Cir.1971) (severance required where government's case covered more than 2,300 pages of transcript, less than 50 of which were relevant to Donaway).

Vasquez–Velasco argues that he was prejudiced by the introduction into evidence of a "gruesome and emotionally moving" audio-taped recording of Camarena's interrogation by his captors. He contends that the tapes, in concert with the "gruesome ... evidence pertaining to the location and forensic analysis of Camarena's body," evidence that pertained only to his codefendants, was so emotional that a jury could not but be prejudiced against him and infer his guilt from the murder of Camarena. (Appellant's Brief at 25–27).

Vasquez–Velasco has not presented any reasons, other than the emotionally-charged nature of the Camarena murder, as to why the jury would be unable to consider separately the evidence that applies to the two pairs of murders. Instead, those factors we traditionally rely on to demonstrate lack of prejudice are all present. First, the district court carefully instructed the jury that the tapes could not be considered as evidence against Vasquez–Velasco and that the jury should not be swayed by their emotions. Second, the murders of Walker and Radelat and of Camarena and Zavala were separate incidents that occurred approximately a week apart. As such, they were discrete acts that a jury could compartmentalize reasonably easily. Third, the fact that the jury returned discrete and selective verdicts against each of the four codefendants on four separate days can be seen as evidence of their ability to compartmentalize both the charges and the evidence. *See Cuozzo,* 962 F.2d at 950 (finding selective verdicts to be indicative of jury's ability to compartmentalize the evidence); *United States v. Unruh,* 855 F.2d at 1374 (lengthy deliberations and failure to convict all defendants on all counts is evidence of jury's ability to compartmentalize evidence). Finally, we agree with the district court that

rather than being wholly disparate in nature, the murders of Walker and Radelat were just as "grievous" and "heinous" as those of Camarena and Zavala.

We therefore hold that the district court did not abuse its discretion in denying Vasquez–Velasco's motions to sever.

## IV. Length of Sentence

■ Vasquez–Velasco appeals the district court's imposition of a sentence greater than ten years in the absence of a special verdict. He argues that because of an ambiguity in the jury instructions, it is not clear whether the jury convicted him for *participating* in the murders of Walker and Radelat, or for *conspiring* to commit the murders. Under § 1959, the maximum sentence for participation in a relevant crime is life imprisonment and a $50,000 fine, while the maximum sentence for conspiring to commit such a crime is 10 years imprisonment and a $10,000 fine. 18 U.S.C. §§ 1959(a)(1) & (a)(5). Thus, he argues that the district court erroneously assumed that the jury found him to be a principal and not a conspirator in the crimes charged, and in imposing a sentence of life imprisonment.

### A. Standard of review

■ The legality of a sentence is generally reviewed de novo. *United States v. Fine*, 975 F.2d 596, 599 (9th Cir.1992) (en banc). However, the circumstances of this case require us to review the district court's sentence for plain error. *See United States v. Aguilar*, 883 F.2d 662 (9th Cir.1989), *cert. denied*, 498 U.S. 1046, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991).

In *Aguilar*, the defendants were convicted of a conspiracy to harbor illegal aliens under 8 U.S.C. § 1324. The jury did not specify which of the four subsections of § 1324 it relied on for its conviction and the appellants

argued that reversal was required because without a special verdict, there was no way to know what motivated the jury to convict or if the conviction was unanimous. *Id.* at 690–91. We held that special verdicts are the exception, not the rule; when a special verdict is appropriate to record the jury's thinking for appeal, it is defense counsel's duty to request it. *Id.* (stating that "[f]ailure to make a request to the trial court waives any error (except plain error) premised on the lack of a special verdict"); *see also United States v. Jones*, 425 F.2d 1048, 1057 (9th Cir.), *cert. denied*, 400 U.S. 823, 91 S.Ct. 44, 27 L.Ed.2d 51 (1970) (where defendant is convicted of five counts of mail fraud and one count of conspiracy, the object of which was commission of one of the five counts of mail fraud, failure of defense counsel to request special verdict waives any error); *United States v. Harrell*, 737 F.2d 971, 981–82 (11th Cir.1984), *cert. denied*, 470 U.S. 1027, 105 S.Ct. 1392, 84 L.Ed.2d 781 (1985) (failure to request special verdict, to challenge indictment, or to challenge jury instructions prevents challenging sentence based on ambiguous guilty verdict for anything other than clear and prejudicial error).

■ The rationale applied in *Aguilar* is appropriate here: a defendant should not benefit from trial court decisions that lead to ambiguities that counsel failed to resolve at trial.[11] Because Vasquez–Velasco did not request either a special verdict or clarifying jury instructions, we review his claim for plain error.

### B. Correctness of sentence

■ Vasquez–Velasco finds ambiguity in the jury verdict based on the jury instructions. All four codefendants were charged with violations of § 1959. In describing the elements of a violation of that section, the district court instructed the jury:

---

11. Several courts have suggested that it is the duty of the government to seek a special verdict when the information sought is relevant to the sentence to be imposed. *See United States v. Orozco–Prada*, 732 F.2d 1076, 1083–84 (2d Cir.), *cert. denied*, 469 U.S. 845, 105 S.Ct. 154, 83 L.Ed.2d 92 (1984); *Brown v. United States*, 299 F.2d 438 (D.C.Cir.), *cert. denied*, 370 U.S. 946, 82 S.Ct. 1593, 8 L.Ed.2d 812 (1962). However, in

these cases the indictment either included a count that charged the violation of more than one statutory provision, each requiring a different sentence, or one count that charged the violation of a single conspiracy statute that has more than one object. In this case, Counts One and Two charged Vasquez–Velasco only with participation in the murders, and not with conspiracy.

In order to establish the offenses charged in counts 1, 2, 3 and 4 of the Indictment, the following essential elements must be established beyond a reasonable doubt: ....

Fourth: Either the defendant participated in the commission of the violent act as charged or the defendant aided and abetted in the commission of the violent acts as charged or that the defendant *conspired* in the commission of the violent acts as charged. There must be unanimous agreement among the jurors that the defendant engaged in at least one of the types of conduct described above. That is, either he was a direct participant or aided and abetted others in committing the violent acts or that he *conspired* in the commission of the violent acts.

\* \* \* \* \* \*

The defendant Javier Vasquez–Velasco is charged in Count 1 of the Indictment with a violent act, *being a principal in and aiding and abetting* the murder of John Walker in support of an enterprise engaged in racketeering in violation of Title 18, United States Code, Sections 1959 and 2; and in Count 2 of the Indictment with a violent act, *being a principal and aiding and abetting* the murder of Alberto Radelat in support of an enterprise engaged in racketeering in violation of the same statute. So defendant Vasquez is charged in Counts 1 and 2 only.

No other defendant was charged in those counts.

(Supp.Excerpt of Record at 104–06) (emphasis added). Vasquez–Velasco argues that these instructions led the jury to believe that they could find him guilty based on conspiracy.

We disagree because we conclude that the jury instructions were unambiguous. While the general jury instructions with respect to

the elements of § 1959 did contain references to conspiracy, the specific instructions regarding the charges against Vasquez–Velasco unambiguously stated that he had been charged only with participation in the murders, and not with conspiracy. The instructions go on to mention conspiracy with respect to the charges against the other three codefendants and make specific references to the "conspiracy as charged in Count 3," a count with which Vasquez–Velasco was not charged. *Id.* at 109–10.

In addition, the Indictment in this case was clear and unambiguous in charging Vasquez–Velasco only with participation in the murders and not with conspiracy. The unambiguous indictment reinforces our conclusion that the jury was not misled to believe that it could convict Vasquez–Velasco of conspiracy.[12]

Because the jury instructions were clear in stating that Vasquez–Velasco was charged only with participating in the murders, and because the indictment was also clear in this respect, we conclude that the jury convicted Vasquez–Velasco of participation in the murders of Walker and Radelat and affirm the sentence imposed by the district court.

## CONCLUSION

We hold that the district court properly found that § 1959 applies extraterritorially to reach the crimes committed by Vasquez–Velasco in Mexico. We also hold that the district court did not abuse its discretion in denying Vasquez–Velasco's motions for severance and misjoinder. Nor did the district court err in sentencing Vasquez–Velasco to a term of life imprisonment. We affirm.

**AFFIRMED.**

---

12. In cases where a single count of an indictment charges a defendant with conspiracy to distribute more than one type of drug (usually cocaine and a non-narcotic), each of which carries significantly different sentences, many courts give the defendant the benefit of the lesser sentence in the absence of a special verdict that specifies the drug on which the jury based its conviction. *E.g., United States v. Pace,* 981 F.2d 1123 (10th Cir.1992), *cert. denied,* —— U.S. ——,

113 S.Ct. 1401, 122 L.Ed.2d 774 (1993) (choosing lesser sentence due to ambiguity as to whether conspiracy charge is based on distribution of methamphetamine or amphetamine); *United States v. Owens,* 904 F.2d 411, 414–15 (8th Cir. 1990) (same). Because Counts One and Two of the indictment clearly charge Vasquez–Velasco only with participation, not with conspiracy, these cases are inapplicable.