59 F.3d 176
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Maria Cecilia BARONA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Janet MARTINEZ, aka: Luz Janet Martinez & Luz Janeth
Martinez, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Brian BENNETT, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Mario Ernesto VILLABONA-ALVARADO, a/k/a Tico, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael Dubarry McCARVER, a/k/a Mike Bald, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael HARRIS, a/k/a Tall Make, Defendant-Appellant.
 Nos. 90-50519, 90-50536, 90-50686, 90-50687, 90-50691, 90-50694.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Oct. 5, 1994.
Decided June 6, 1995.
 
 1
 Appeal from the United States District Court, for the Central District of California, D.C. Nos. CR-88-0972-WJR-3, CR-88-0972-WJR-4, CR-88-0972-WJR-2, CR-88-0972-WJR-1, CR-88-0972-WJR-7 and CR-88-0972-WJR-6. William J. Rea, District Judge, Presiding.
 
 
 2
 C.D.Cal.
 
 
 3
 REVERSED.
 
 
 4
 Before: WALLACE, Chief Judge, REINHARDT, Circuit Judge, and TANNER,* District Judge.
 
 MEMORANDUM
 
 5
 Six appellants, Barona, Martinez, McCarver, Harris, Villabona, and Bennett, were convicted of drug-related crimes. This disposition resolves most of the claims raised on appeal. Those issues not addressed are discussed in United States v. Barona, Nos. 90-50519, 90-50536, 90-50686, 90-50687, 90-50691, and 90-50694, slip op. 6205 (9th Cir. June 6, 1995) (Barona ), which arises out of the same appeals. The district court had jurisdiction under 18 U.S.C. Sec. 3231. We have jurisdiction to hear this timely appeal pursuant to 28 U.S.C. Sec. 1291.
 
 
 6
 * The first issue raised by the appellants is whether the district court should have severed their trial. The abuse of discretion standard governs our determination of the district court's severance ruling. United States v. Baker, 10 F.3d 1374, 1386 (9th Cir.1993) (Baker ), cert. denied, 115 S.Ct. 330 (1994). Because the district court has broad discretion to deny motions for severance under Federal Rule of Criminal Procedure 14, and because Federal Rule of Criminal Procedure 8(b) specifically allows joinder of defendants where they participated in the same acts or transactions, we ask "whether a joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial." United States v. Patterson, 819 F.2d 1495, 1501 (9th Cir.1987), quoting United States v. Abushi, 682 F.2d 1289, 1296 (9th Cir.1982). Among other things, we consider: (1) judicial economy, (2) convenience to witnesses, (3) the avoidance of delay, (4) whether there are inconsistent defenses being raised, (5) whether the jury will be able to compartmentalize and appraise the independent evidence against each defendant, (6) whether the confrontation rights of a defendant are compromised, (7) whether exculpatory evidence would be unavailable in a joint trial, and (8) whether the trial would be excessively long. Baker, 10 F.3d at 1386-92. So long as "the jury may reasonably be expected to collate and appraise the independent evidence against each defendant" there is no prejudice. Id. at 1387. "The best evidence of the jury's ability to compartmentalize the evidence is its failure to convict all defendants on all counts." Id.
 
 
 7
 In this case, Villabona was acquitted of several charges (counts 6, 10, and 11) and no verdict was reached on count 9. Furthermore, the facts demonstrate that Barona and Martinez were part of the whole conspiracy, and repeatedly spoke with the alleged co-conspirators about the matters charged. In Baker, we upheld the district court's refusal to sever the trial of defendant Cole, even though Cole was charged with one count, and there were 24 defendants in a 44 count indictment, resulting in a 16 month trial. Id. at 1391. Each of the appellants' involvement here was more extensive that Cole's. The trial evidence against each appellant would have been largely cumulative. Separate trials would have been uneconomical. The district judge found that each defendant could receive a fair trial. We conclude that the district judge did not abuse his discretion by trying all of the appellants together.
 
 II
 
 8
 A second issue raised concerns only Barona and Martinez, who argue that their sentence should be reduced based on their role and culpability in the conspiracy. We review for clear error, and observe that a "sentencing judge is in a unique position to evaluate the defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." See U.S.S.G. Sec. 3E1.1 (comment 5).
 
 
 9
 Barona contends that she "accepted responsibility" for her crime in accordance with section 3E1.1 of the Guidelines, and that she played a "minor role" in the conspiracy, as defined by section 3B1.2 of the Guidelines. We conclude that the district judge did not clearly err by failing to reduce Barona's sentence under the Guidelines. It is only in "rare cases" that a defendant, once convicted at trial, can demonstrate the requisite acceptance of responsibility. U.S.S.G. Sec. 3E1.1. Only "pre-trial statements and conduct" are to be considered. See id. (comment 2). The only evidence of an "acceptance" in Barona's case is a letter, submitted to the court in camera, two months after her conviction, and a statement by Barona at sentencing that she was "very sorry." The district court refused to accept or read the letter; there is no provision allowing the district court to consider the letter without disclosing it to the government. Because Barona did not want the letter disclosed, the district court refused to consider it. Furthermore, even if the district court should have read the letter, it would not constitute acceptance of responsibility under section 3E1.1, because the letter was submitted well after Barona's conviction.
 
 
 10
 Barona also argues that she was a "minor participant" in the crime under section 3B1.2. That section is "used infrequently and only in exceptional circumstances." See United States v. Davis, 36 F.3d 1424, 1436 (9th Cir.1994). A downward departure of a sentence under this section is not required when the defendant shows that he or she was the "least significant" player--what is required "is that he [or she] be a minimal or minor participant." See United States v. Rexford, 903 F.2d 1280, 1283 (9th Cir.1990). The district court found that Barona's "role throughout this entire case has been a major one and has been a long-term one, and it has shown that she has a position of great responsibility for ... the distribution of the cocaine and the collection of the money." This finding is not clearly erroneous.
 
 
 11
 Martinez also contends that she was a "minor participant," and that an adjustment downward in her sentence said that the presentence report "indicates that the defendant is felt to be one of the more culpable of the defendants in terms of relative culpability." This finding is not clearly erroneous. The district judge found that "under the circumstances, the totality of the circumstances, the severity of the offenses for which she has been convicted warrants the upper range of the sentencing guidelines range of 188 to 235 months." This sentence was within guideline range.
 
 III
 
 12
 The next issue raised was whether the district court properly determined the validity of a domestic wiretap application. The domestic wiretap evidence, consisting of four different taps on five mobile telephones, implicates Martinez, Barona, Bennett, McCarver, and Villabona. The wiretaps (granted on September 23, October 18, October 31, and November 10, 1988) were for 30 day periods. The main argument is that the wiretap inception orders were inadequate because the investigating officers failed to satisfy the "necessity" requirements of 18 U.S.C. Sec. 2518(3)(c).
 
 
 13
 Section 2518(3)(c) requires the judge to determine, before a wiretap is authorized, that "normal investigative procedures" have been tried and have failed, or that such procedures appear unlikely to succeed if tried or are too dangerous. The district judge has discretion when determining the necessity of a wiretap. See United States v. Brone, 792 F.2d 1504 (9th Cir.1986). The affidavit must "set out a factual background that shows that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case." Id. at 1506. Failure to satisfy the necessity requirement can result in suppression. United States v. Ippolito, 774 F.2d 1482 (9th Cir.1985).
 
 
 14
 United States Special Agent John Comer submitted a lengthy (84 page) affidavit, dated September 23, 1988, that detailed the information the government had on Villabona, Bennett, McCarver, Barona, and Martinez and documented all of their movements through September of 1988. This affidavit served as a basis for all of the domestic wiretaps, as each subsequent affidavit also incorporated the factual specificity of the September 23, 1988, affidavit. Agent Comer's affidavit also outlined why mobile telephone conversations were suspected to link the various participants in the conspiracy. The pattern of numbers being called--and the frequency with which they were being called--suggested that certain mobile telephones were being used for illegal activity. The Comer affidavit also set forth the investigative techniques that had been tried and had failed, and the techniques not likely to succeed. These included informants and confidential sources, the use of undercover agents, physical surveillance, aerial surveillance, pen registers, grand jury investigation, search warrants, suspect interviews, and trash searches. This is not a case, as in United States v. Kalustian, 529 F.2d 585, 589 (9th Cir.1975), where the government was seeking a wiretap merely because the case was "tough to crack." Agent Comer set forth specific facts and discussed why alternate methods had either failed or were reasonably likely to fail. Given the extensive amount of previous surveillance, the inability of pen registers to identify the parties, and the normal investigative procedures utilized up until September 1988, the district court did not abuse its discretion when it authorized each of the domestic wiretaps.
 
 IV
 
 15
 Several of the appellants argue that prejudicial or irrelevant evidence was admitted against him or her. We review for an abuse of discretion whether evidence was prejudicial or relevant. United States v. Daly, 974 F.2d 1215, 1216-17 (9th Cir.1992). We review de novo the construction of the Federal Rules of Evidence. United States v. Diaz, 961 F.2d 1417, 1419 (9th Cir.1992).
 
 
 16
 Martinez argues that many tape conversations had no relation to her and were highly prejudicial because they created a spillover effect. But this contention goes to whether a severance should have been granted.
 
 
 17
 Martinez also argues that the tape recorded conversations of others were hearsay under Rule 801 of the Federal Rules of Evidence. But "acts and statements of co-conspirators are admissible against other conspirators." United States v. Lothian, 976 F.2d 1257, 1262 (9th Cir.1992). Evidence that was properly admitted linked Martinez to the conspiracy by showing that (1) Martinez discussed with Villabona a 300 kilogram delivery on December 9, 1987, (2) Martinez delivered 320 kilograms of cocaine to Harris, and (3) Martinez was told in March 1988, to look for a supply source in Columbia. Any improperly admitted evidence was harmless. See United States v. Attardi, 796 F.2d 257, 260 (9th Cir.1986).
 
 
 18
 Martinez further argues that testimony of government witnesses Ilse Rubio, an employee of Costa Azul Travel Agency who identified Martinez's voice, and Haracio Marco, an undercover police officer whose testimony linked "Operation Pisces" with other appellants, was prejudicial and irrelevant. Rubio's testimony was clearly relevant, as it tended to show Martinez had incriminating conversations with co-conspirators. Cross-examination was allowed. Marco's testimony was probative of the fact that Gomez, a drug dealer, was known to Martinez (Gomez's telephone number was in Martinez's 1986 telephone book). Villabona was connected with both Gomez and Rios, and Villabona told Martinez to talk to Rios to secure additional sources of cocaine. Therefore, the connection between Villabona, Gomez, and Rios was relevant to show that Martinez understood Villabona's instructions.
 
 
 19
 Bennett contends that papers and documents seized from his hotel room in Denmark should be suppressed. However, none of these notes were introduced at trial and Bennett has not alleged what evidence, if any, resulted from these notes. He did not even raise this argument during trial. There was no showing of improper use of these notes.
 
 
 20
 Bennett also maintains that evidence from 13 searches conducted pursuant to a warrant based upon an affidavit of Deputy John Edner should be suppressed. However, no evidence from these searches was admitted at trial either, and Bennett did not specify any other evidence that resulted from these searches.
 
 
 21
 Villabona argues the relevancy of evidence admitted against him, as well as the introduction of certain ledgers obtained during searches. Villabona's main evidence arguments are that evidence of a June 1, 1988, seizure of $6.8 million in drug money (the "Lori Street Incident"), evidence from "Operation Pisces," and evidence of a November 6, 1988, seizure of 502 kilograms of cocaine were improperly admitted and unfairly prejudiced him, because the government could not link Villabona to those events.
 
 
 22
 Operation Pisces resulted in the arrest of Leonardo Gomez (aka Santiago or Loquillo), as well as "Zapata," a dealer in Central America. Gomez was arrested on May 6, 1987. When Zapata was arrested in Central America, a ledger was obtained that documented two money deliveries made by Gomez. Not only was Gomez arrested in Villabona's house, but in March 1987, after the first delivery of money, Gomez and Rios drove to Villabona's residence. Villabona also told Martinez at one point to ask Rios to be an additional cocaine source. The evidence showed a clear connection between Villabona, Gomez, Rios, Martinez, and Zapata. The district judge did not abuse his discretion when he admitted this evidence.
 
 
 23
 Regarding the "Lori Street Incident," the government introduced evidence that $6.8 million was seized from a residence that was identified through conversations Villabona had with someone called "Santos." The defense argued that Villabona's conversations did not show that the numbers discussed in Villabona's conversations related to money. The seizure of the large amount of money and of a ledger that referred to Santos showed that Santos's business related to large amounts of drug money, and that the residence was used for drug activity. The evidence of the seizure was relevant to show that Villabona was discussing drugs and drug money. See United States v. Jaramillo-Suarez, 950 F.2d 1378, 1383 (9th Cir.1991) (drug-related documents "may properly be admitted to prove the character and use of the place where found").
 
 
 24
 Finally, we consider the 502 kilograms of cocaine that a Missouri state trooper found in a vehicle driven by Childress and James McCarns. The record supports Villabona's knowledge and involvement in this incident. Villabona spoke with Stanley McCarns about talking to Bennett in order to get a lawyer for James McCarns. Villabona ultimately did speak to Bennett about James McCarns, and Bennett informed Villabona that 200 kilograms (a "$2 phone bill") of cocaine that was left in James McCarns's apartment had been picked up. The other evidence that Villabona contests relates to charges for which Villabona was ultimately acquitted, and, therefore, do not require our review.
 
 V
 
 25
 In addition to their evidentiary contentions, several appellants assert that the evidence against him or her was insufficient. Bennett's and Villabona's continuing criminal enterprise (CCE) convictions (counts 27 and 28) under 21 U.S.C. Sec. 848 are discussed in Barona, slip op. at ----. We now discuss the other counts.
 
 
 26
 When reviewing for insufficient evidence, we view the evidence in the light most favorable to the prosecution and determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. United States v. Bishop, 959 F.2d 820, 829 (9th Cir.1992).
 
 
 27
 Barona was charged with and convicted of counts 1-5, which included conspiracy (18 U.S.C. Sec. 846), possession of cocaine with intent to distribute on three different occasions (21 U.S.C. Sec. 841(a)(1); 18 U.S.C. Sec. 2), and aiding or abetting the possession of an additional 502 kilograms of cocaine with intent to distribute (21 U.S.C. Sec. 841(a)(1); 18 U.S.C. Sec. 2).
 
 
 28
 Barona discussed with both Villabona and Bennett the arrival of drugs and drug money on several occasions. Barona delivered drugs at Villabona's request. There was a definite agreement to engage in criminal activity and the requisite intent, as well as overt acts in furtherance of that agreement to distribute large quantities of drugs and cash. These are the elements of conspiracy. See United States v. Litteral, 910 F.2d 547, 550 (9th Cir.1990). The evidence also showed that on three separate occasions in December 1987, Barona spoke with Villabona and Bennett about delivering drugs and collecting money (supporting counts 2-4). The evidence linking Barona to count 5 was also sufficient. Count 5 charged Barona with aiding and abetting in the possession of 502 kilograms of cocaine--the amount seized on November 6, 1988, when James McCarns and Childress were arrested in Missouri. Bennett had contacted Stanley McCarns to arrange for transportation of cocaine from Los Angeles to Detroit. Ongoing shipments of drugs from Los Angeles were bound for Detroit. Not only was Barona a member of the conspiracy, but she was in Detroit awaiting deliveries from Los Angeles. On November 16, 1988, Barona was contacted by Villabona regarding a drug shipment to Detroit. Barona subsequently was arrested in Detroit. The evidence, when viewed in the light most favorable to the government, was sufficient to convict her of aiding and abetting in this drug delivery.
 
 
 29
 Martinez was indicted and convicted of counts 1-4 for engaging in the conspiracy, conspiring to possess and possessing cocaine with intent to distribute, and aiding and abetting with intent to distribute. Martinez was linked to conversations with Villabona on December 9, 1987, in which she discussed the delivery of 300 kilograms of cocaine. On December 10, 1987, Martinez and Barona delivered 320 kilograms to Harris. She told Villabona that she had another 345 kilograms to deliver the next day. In a March 1988, conversation, Villabona told Martinez to find an additional drug supplier in Columbia. These conversations all support an inference of guilt and knowing participation in the drug scheme. See United States v. Buena-Lopez, 987 F.2d 657, 659 (9th Cir.1993). Martinez's voice was identified by travel agent Rubio. The jury could have accepted this, and Rubio's identification of Martinez's voice was enough to link her to the crimes charged. There was also evidence that showed that Martinez arranged for the delivery of (and delivered) several hundred kilograms of cocaine in December 1987. Villabona would often refer to "the girls" (meaning Barona and Martinez) when discussing drug transactions.
 
 
 30
 Martinez also contends that a "single conspiracy" was not established. "[W]hether a single conspiracy has been proved, rather than multiple conspiracies ... is essentially a question of the sufficiency of the evidence." United States v. Bibbero, 749 F.2d 581, 586 (9th Cir.1984) ( Bibbero ), cert. denied, 471 U.S. 1103 (1985). At times, we have considered "the nature of the scheme; the identity of participants; the quality, frequency, and duration of each conspirator's transactions; and the commonality of time and goals." Id. at 587. "A single conspiracy may involve several sub-agreements or subgroups of conspirators." United States v. Lujan, 936 F.2d 406, 411 (9th Cir.1991), quoting Bibbero, 749 F.2d at 587.
 
 
 31
 In this case, the jury could have found the existence of a single conspiracy. The nature of the conspiracy was a cocaine distribution and money collection enterprise, with Bennett and Villabona supervising. The identity of the parties becomes obvious from the telephone records. Conversations and actions link Villabona, Bennett, Martinez, Barona, Harris, and McCarver. For example, Barona and Martinez delivered cocaine to Harris and McCarver for resale. Villabona and Bennett spoke to Barona and Martinez about collecting money and delivering cocaine. Toll records of calls made with cellular telephones also connected all of the appellants; often Villabona would call Barona and Martinez and then immediately call Harris or Bennett. Bennett and Villabona, while traveling abroad, contacted Martinez and Barona about their transactions. These contacts were also constant over time. All of the appellants had a different role but a common plan and goal. A rational jury could have concluded that there was one large conspiracy.
 
 
 32
 Bennett was charged and convicted of counts 1-5 (conspiracy and possession with intent to distribute under 21 U.S.C. Secs. 846, 841(a)(1)), counts 12 and 17 (violations of 31 U.S.C. Sec. 5324, illegal structuring), and count 28 (being a principal administrator of a CCE in violation of 21 U.S.C. Sec. 848). The evidence is sufficient to convict him of all counts discussed in this disposition, except for the counts involving illegal structuring, which are discussed later.
 
 
 33
 Villabona was charged and convicted on counts 1 (conspiracy), 2-5 (possession with intent to distribute), 7-8 (money laundering), 12-16 (illegal structuring), 19-26 (money laundering), and count 27 (being a principal administrator in a CCE).
 
 
 34
 Count five involves the seizure of 502 kilograms of cocaine in Missouri. The evidence shows that Villabona was involved in this November 1988, shipment of cocaine from Los Angeles to Detroit. Bennett arranged for Stanley McCarns to secure drivers (James McCarns and Childress) for the shipment. Villabona had conversations with Stanley McCarns about the arrest of James and Childress. Villabona also discussed Stanley McCarns with Bennett. The evidence also supported the view that the November shipment was part of a larger, 700 kilogram shipment and that the extra 200 kilograms was stored in McCarns's garage and later picked up. Bennett relayed this information to Villabona on November 16, 1988. A rational jury could have found Villabona connected with the 502 kilogram shipment in November.
 
 
 35
 Counts 7 and 8 relate to "Operation Pisces." Leonardo Gomez and Reynaldo Rios made deliveries on March 26 and March 30, 1987. The two men drove to Villabona's residence after delivering the money on March 26. Gomez was ultimately arrested there on May 6, 1987. Money laundering under 18 U.S.C. Sec. 1956(a)(1) requires proof that the defendant "conducted a financial transaction" involving "proceeds of unlawful activity," and that the defendant knew the proceeds came from unlawful activity, and either (a) intended to promote the carrying on of the specific unlawful activity or (b) knew the transaction was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds. See United States v. Montoya, 945 F.2d 1068, 1076 (9th Cir.1991). In this case, there was evidence that Villabona aided in this money laundering transaction. Gomez, immediately following the March deliveries, called Villabona on Villabona's cellular telephone. Gomez also went to Villabona's house following each transaction. Villabona also paid for Gomez's legal defense. Villabona discussed Gomez's failed attempt to escape prison with Oscar (a Colombian cocaine supplier). The evidence was sufficient to show that Villabona was aware of and participated in this laundering scheme.
 
 
 36
 Counts 12-17 charge Villabona and/or Bennett with aiding and abetting Jimmy Washington (who pled guilty) in illegal structuring (e.g. breaking up transactions involving more than $10,000 to evade requirements that financial institutions report transactions in excess of $10,000) in violation of 31 U.S.C. Sec. 5324. Ratzlaf v. United States, 114 S.Ct. 655 (1994), holds that a defendant may not be convicted of willfully violating section 5324 unless the jury finds that the defendant "knew the structuring in which he engaged was unlawful." Id. at 663. Because the jury instructions did not require this finding, we reverse Villabona's and Bennett's conviction and sentence for these counts. As the district court did not enhance the sentences for the other counts based on these convictions, there is no need for a remand for resentencing. See Baker, 10 F.3d at 1421; United States v. Ray, 731 F.2d 1361, 1368 (9th Cir.1984) (Ray ).
 
 
 37
 Counts 19-26 involve laundering drug money in violation of 18 U.S.C. Sec. 1956. Villabona argues that the source of the money was not proven. However, the evidence is clearly sufficient to establish that Villabona's money came from the sale of narcotics.
 
 
 38
 McCarver was convicted of conspiracy (count 1) and substantive drug offenses (counts 2-5). The evidence was sufficient to convict McCarver. Numerous telephone calls between Bennett and McCarver establish that McCarver delivered drugs to Barona and Martinez, collected drug money, and supplied others with drugs. The testimony of Stanley McCarns, stating that Bennett referred to kilograms of cocaine with terms like "chickens" and "birds," made any reference to these terms in McCarns's conversations unambiguous.
 
 VI
 
 39
 Villabona argues that venue was not proper on counts 2-4. Offenses shall be prosecuted "in a District in which the offense was committed." See Fed.R.Crim.P. 18. Villabona was involved in distributing and organizing deliveries of cocaine in Los Angeles. On December 6, 1987, Villabona called Barona in Los Angeles to discuss a drug transaction. On December 9, 1987, Villabona spoke with Martinez in Los Angeles and discussed a drug transaction. And on December 10, 1987, Villabona called Harris in Los Angeles and discussed a transaction between Harris and "the girls" (Barona and Martinez). After the December call to Harris, Villabona called Martinez in Los Angeles to confirm that she had a substantial quantity of cocaine to deliver to Harris. Villabona then called Harris back and arranged for the delivery of the cocaine, and he thereafter called Martinez and told her to deliver the drugs to Harris. Martinez (in Los Angeles) then telephoned Harris (in Los Angeles) and then called Villabona back, telling him "mission accomplished" and discussing another cocaine delivery (this time to McCarver) to take place the next day. These conversations between Villabona, Martinez, and Harris show that Villabona aided and abetted the possession of cocaine in the Central District of California (counts 2-4).
 
 VII
 
 40
 Bennett and Villabona contend that the jury instructions regarding the CCE statute resulted in an ex post facto application as to them. Bennett and Villabona argue that the jury instructions "permitted the jury to convict upon facts occurring before the effective date" of 21 U.S.C. Sec. 848(b). This argument misconstrues the applicability of the ex post facto clause.
 
 
 41
 A person is engaged in a CCE if, among other things, he violates at least three felony violations of federal narcotics law. United States v. Hernandez-Escarsega, 886 F.2d 1560, 1571 (9th Cir.1989) (Hernandez-Escarsega ), cert. denied, 497 U.S. 1003 (1990). Villabona and Bennett assert that the three acts that constitute the "continuing series" of narcotics violations cannot be acts occurring before October 26, 1986, the effective date of the statute. They then assert that the jury instructions permitted the jury to convict based on facts that occurred before this date.
 
 
 42
 Using pre-October 26, 1986, acts as one of the "series of violations" for establishing the existence of a CCE may violate the ex post facto clause. The ex post facto clause prohibits punishing as a crime any act previously committed that was innocent when done, imposing a harsher punishment for a crime after it is completed, or depriving one of a defense available under law when the act was committed. Baker, 10 F.3d at 1394. But we need not reach that issue. "It is well established that a statute increasing a penalty with respect to a criminal conspiracy which commenced prior to, but was continued beyond the effective date of the statute, is not ex post facto as to that crime." United States v. Campanale, 518 F.2d 352, 365 (9th Cir.1975), cert. denied, 423 U.S. 1050 (1976).
 
 
 43
 Therefore, the jury could consider pre-October 26, 1986, acts to determine whether the conspiracy existed, but could only consider the subclass of post-October 26, 1986, acts within that entire conspiracy in order to determine if Villabona and Bennett were engaged in supervising a CCE. That certain acts in furtherance of the overall conspiracy may have occurred before the effective date of section 848(b) is of no moment.
 
 
 44
 The district judge specifically limited the jury to considering post-October 27, 1986, acts relating to section 848(b)'s requirement that Villabona and Bennett be a principal administrator, including whether they received substantial revenue (at least $10 million in gross receipts) or were involved in a series of drug violations involving at least 150 kilograms of cocaine.
 
 
 45
 The jury instruction quoted by Villabona allowed the jury to consider "any relevant conduct ... in determining whether defendant Villabona caused a series of violations of the federal narcotic laws, and whether he did so in concert with at least five other persons...." But that instruction is then modified and made clearer by the instruction immediately following the one quoted by Villabona: "With respect to count one, however, you must find that defendant Villabona participated in the conspiracy charged in that count and that all essential elements of that count were proven to exist after October 27th, 1986, in order to consider count one as one of the series of violations alleged in count twenty-seven." (Emphasis added.) This charge clarifies what acts are to be considered by the jurors in determining whether a "series of violations" occurred to satisfy the conditions of the CCE statute.
 
 
 46
 The next instruction specifically limits the jurors to considering post-October 27, 1986, conduct in determining whether Villabona was a principal administrator of a CCE, whether the enterprise received over $10 million in gross receipts, and whether the series of narcotic violations involved at least 150 kilograms of cocaine. The instructions regarding Bennett were the same. When viewed in their entirety, the instructions did not allow the jurors to use pre-October 26, 1987, conduct to convict Villabona and Bennett of a CCE. These instructions, taken as a whole, were not "misleading" or "inadequate to guide the jury's deliberations." Baker, 10 F.3d at 1417, quoting United States v. Shortt Accounting Corp., 785 F.2d 1448, 1454 (9th Cir.), cert. denied, 478 U.S. 1007 (1986).
 
 VIII
 
 47
 Villabona raises two other complaints about the jury instructions. He first argues that the quantity of drugs required under section 848(b)(2)(A) is not 150 kilograms (as the district judge instructed) but rather 1500 kilograms. It is clear that section 848(b)(2)(A) requires "at least 300 times" the quantity of cocaine referenced in section 841(b)(2)(B). That amount is 300 times "500 grams or more." This equals 150 kilograms or more of cocaine. The jury was properly instructed on this point.
 
 
 48
 Villabona next argues that special verdicts were improper in this case and were used solely to correct a problem with the jury instructions that allowed jurors to apply the CCE statute in violation of the ex post facto clause. We have already concluded that there was no ex post facto violation. While special interrogatories are "generally disfavored," United States v. Pforzheimer, 826 F.2d 200, 205 (2d Cir.1987) (Pforzheimer ), "most criticism of special verdicts in criminal cases is based on the danger that such verdicts might be devices for bringing judicial pressure to bear on juries in reaching their verdict." United States v. O'Looney, 544 F.2d 385, 392 (9th Cir.), cert. denied, 429 U.S. 1023 (1976). That did not occur here, and there was no reversible error. See Pforzheimer, 826 F.2d at 206; United States v. Vasquez-Velasco, 15 F.3d 833, 847 & n. 11 (9th Cir.1994). In this case the special verdict was not given to the jury until after the general verdict--so there was no chance of improper influence. Villabona gives no reason for thinking that the special verdict forms were improperly used in this case. The district court did not abuse its discretion in submitting special verdicts.
 
 IX
 
 49
 Villabona and Bennett further contend that sections 848(c)(2)(A) and 848(b)(2)(A) of the CCE statute are unconstitutionally vague. To prove a statute unconstitutionally vague, it must be shown that the statute "(1) does not define the conduct it prohibits with sufficient definitiveness and (2) does not establish minimal guidelines to govern law enforcement." Baker, 15 F.3d at 911.
 
 
 50
 We have previously held that the words "organizer," "supervisory position," and "management" "enjoy a wide currency in the business community and are commonly understood by members of the general public." Ray, 731 F.2d at 1367, quoting United States v. Valenzuela, 596 F.2d 1361 (9th Cir.), cert. denied, 444 U.S. 865 (1979).
 
 
 51
 Section 848(b)(2)(A) refers to violations in "subsection (d)(1) of this section." There is no such subsection. But Congress obviously meant subsection (c)(1); there is a typographical error in the statute. In any event, we need not reach the issue. Even if section 848(b)(2)(A) were unconstitutionally vague, the special verdict informs us that the jury found section 848(b)(2)(B) applicable, which would result in the same mandatory life sentence.
 
 
 52
 Villabona and Bennett also suggest that section 848(c)(2)(A) is vague. This section requires the government to prove that a defendant acted "in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management." The argument is that these terms fail to give adequate notice as to which conduct is prohibited. See United States v. Dorey, 711 F.2d 125, 128 (9th Cir.1983) (Due process "requires that a statute, which is used as the basis of a criminal charge, give fair warning of the conduct which is prohibited so that each person can conform his conduct to the requirements of the law.").
 
 
 53
 Our cases have already rejected similar vagueness arguments. We have held that a district court was not required to define the concepts of "management" or "supervision" because these terms "are neither outside the common understanding of a juror, nor so technical or ambiguous as to require a specific definition." Hernandez-Escarsega, 886 F.2d at 1571, quoting United States v. Johnson, 575 F.2d 1347, 1357-58 (5th Cir.1978), cert. denied, 440 U.S. 901 (1979); see also Ray, 731 F.2d at 1367 (such words are "commonly understood"). The jurors could have found that Villabona and Bennett "supervised" and were "principal administrators" in this ongoing conspiracy. These terms are not unconstitutionally vague.
 
 X
 
 54
 Finally, Villabona raises three arguments regarding improper government conduct. First, Villabona asserts that the prosecutor's argument to the jury was improper. It is impermissible to comment on a defendant's failure to testify because there is a Fifth Amendment right not to do so. Griffin v. California, 380 U.S. 609, 614 (1965). We have held that a prosecutor may not "call attention to the defendant's failure to testify" or make a comment of "such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." United States v. Tarazon, 989 F.2d 1045, 1051-52 (9th Cir.), cert. denied, 114 S.Ct. 155 (1993). In Lincoln v. Sunn, 807 F.2d 805 (9th Cir.1987), we said that an improper comment of this kind warrants reversal "where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for the conviction, and where there is evidence that could have supported acquittal." Id. at 809, quoting United States v. Kennedy, 714 F.2d 968, 976 (9th Cir.1983), cert. denied, 465 U.S. 1034 (1984). If the comment at issue would not have affected the verdict, and curative instructions are given, no reversal results. Id.
 
 
 55
 In this case, the prosecutor was discussing a telephone conversation between Villabona and a party not on trial. The prosecutor asked the jury "What is the phone call which is summarized in exhibit 453 about? If not about drugs and drug money ... what is it about?" That comment was proper, because the prosecutor is allowed to ask the jury to draw inferences from the evidence.
 
 
 56
 The prosecutor continued by saying "Didn't the defense attorneys think that [such an explanation] would be helpful to you in your deliberations." The prosecutor also stated, regarding another call, "What is the subject matter of this call; if not cocaine, what? Each and every defense counsel, silent." The judge, in response to objections, told the jury that the burden of proof remains on the prosecutor. The judge also denied a motion for a mistrial.
 
 
 57
 These comments by the prosecutor do not constitute error under Griffin. As we have said, "comment on the failure of the defense as opposed to the defendant to counter or explain the testimony presented or evidence introduced is not an infringement of the defendant's Fifth Amendment privilege." United States v. Lopez-Alvarez, 970 F.2d 583, 596 (9th Cir.) (emphasis in original), cert. denied, 113 S.Ct. 504 (1992), quoting United States v. Castillo, 886 F.2d 1071, 1083 (9th Cir.1988). The distinction between the defense and the defendant is crucial here. The prosecutor did not say that Villabona failed to testify, and he did not try to get the jury to infer guilt from his failure to testify. Rather, he highlighted several pieces of evidence and asked what alternative explanation was available to explain its meaning. What's more, the judge immediately told the jury that the burden of proof remains on the government. That instruction prevented the jury from inferring that the defense counsel was required to rebut the evidence. See United States v. Soulard, 730 F.2d 1292, 1307 (9th Cir.1984) ("cautionary instruction ... was sufficient to cure any prejudice"). This case is similar to Lopez-Alvarez where "the prosecutor's statement likely referred to the inadequacy of ... evidence and not to the fact that the defendant had not testified." 970 F.2d at 596. The comments here did not "materially affect the fairness of the trial." United States v. Solomon, 825 F.2d 1292, 1300 (9th Cir.1987) (Solomon ), cert. denied, 484 U.S. 1046 (1988).
 
 
 58
 Villabona next contends that the government "misrepresented the truth to the jury" and cites United States v. Kojayan, 8 F.3d 1315 (9th Cir.1993) ( Kojayan ). If a misstatement was made, we will determine whether it was "harmless error beyond a reasonable doubt," because the defense objected to the government's statement at trial. Solomon, 825 F.2d at 1300.
 
 
 59
 The alleged misstatement concerned when the Drug Enforcement Agency (DEA) got access to information contained on the 1987 Denmark wiretap tapes. The government said that these tapes were not translated or available to the DEA until 1988, and that the DEA was not involved in the taping. This fact was meant to show that the DEA could not have secured permission to set up surveillance and to obtain evidence of drug importation during 1987. These isolated comments could not have prejudiced Villabona. The remarks certainly do not rise to the level in Kojayan, where an Assistant United States Attorney told the jury that a potential witness had not entered into an agreement with the government when, in fact, he had. Kojayan, 8 F.3d at 1318. The overall point that the government was trying to make was true: government agents did not have enough information in 1987 to start surveillance in the Los Angeles area. The reason is that the agents did not receive the numbers of the telephones being called by Villabona until the Danish wiretaps were concluded. Without that information, the DEA could not have independently initiated surveillance. That fact was what the prosecutor was trying to convey to the jury. Any misstatement was harmless beyond a reasonable doubt.
 
 
 60
 Villabona's last prosecutorial misconduct argument is that two witnesses--Edward Branch and Ronald Saname--should have been given immunity to testify. Without such, Villabona states that he was denied his due process rights to present a defense and his Sixth Amendment right to confrontation. See United States v. Whitman, 771 F.2d 1348, 1351 (9th Cir.1985) (discussing limitations on discretion to exclude evidence); United States v. Lord, 711 F.2d 887, 892 (9th Cir.1983) (Lord ) (prosecutorial misconduct causing defense witness to assert the Fifth Amendment results in dismissal).
 
 
 61
 Branch's testimony was supposed to show that co-conspirator Stanley McCarn's activity was not part of a conspiracy with Villabona. Saname was to testify that the source of Stanley McCarn's cocaine was not Villabona or Bennett.
 
 
 62
 On cross-examination, the prosecutor asked Branch if he knew what immunity was, and whether he knew that "if you come to court and take an oath and admit a crime, you could be prosecuted for that crime?" This question was prompted by Bennett's attorney, who had asked Branch during direct examination if Branch was promised anything to testify. After a sidebar conference, the judge appointed counsel for Branch and that attorney advised Branch to assert his Fifth Amendment rights. Branch's direct testimony was stricken.
 
 
 63
 The situation here differs from Lord, where prosecutorial misconduct caused a witness to assert his Fifth Amendment rights. In Lord, the prosecutor told a witness that "whether he would be prosecuted depended on his testimony." Lord, 711 F.2d at 890. This was held to be an attempt to influence the witness's decision about whether to testify, and to influence the witness's decision about what to say on the stand.
 
 
 64
 In this case, the prosecutor advised Branch on the stand that he "could be" prosecuted for his crimes. He did not suggest to Branch that he should distort or change his testimony to avoid prosecution. He did not tell Branch he should not testify. A defendant does not have a right to compel the government to grant immunity. "To interpret the Fifth and Sixth Amendments as conferring on the defendant the power to demand immunity for co-defendants, potential co-defendants, or others whom the government might in its discretion wish to prosecute would unacceptably alter the historic role of the Executive Branch in criminal prosecutions." United States v. Mendia, 731 F.2d 1412, 1414 (9th Cir.), cert. denied, 469 U.S. 1035 (1984), quoting United States v. Alessio, 528 F.2d 1079, 1082 (9th Cir.), cert. denied, 426 U.S. 948 (1976). There was no misconduct on the part of the prosecutor regarding Branch.
 
 
 65
 Saname's attorney advised him not to testify absent immunity. Saname took his counsel's advice. Villabona has not charged that the prosecutor purposefully withheld granting immunity to Saname because Saname's testimony would have exonerated Villabona. No claim of prosecutorial misconduct has been stated. Villabona has not shown, as our law requires, that he was denied a "fair trial" or that the government "intentionally distorted" the fact-finding process because Saname did not testify. See United States v. Westerdahl, 945 F.2d 1083, 1086 (9th Cir.1991).
 
 XI
 
 66
 All other issues raised lack merit or are frivolous.
 
 
 67
 We AFFIRM the convictions and sentences of Barona, Martinez, Harris, and McCarver. We AFFIRM Villabona's and Bennett's convictions and sentences with respect to all counts discussed in this disposition except for counts 12-17 (illegal structuring), which we REVERSE. By a separate opinion, we reverse the convictions of Villabona on count 27 and Bennett on count 28.
 
 
 68
 Note: This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.
 
 
 69
 REINHARDT, Circuit Judge, concurring in part and dissenting in part
 
 
 70
 I concur in part and dissent in part. Although the majority correctly decides most of the defendants' claims, I must express my disagreement with some parts of its decision. I briefly outline the reasons for my disagreement below.
 
 
 71
 * * *
 
 
 72
 * * *
 
 
 73
 To begin, I disagree with the majority's holding in Parts IV and V that there was sufficient evidence to prove the existence of a single conspiracy and that the evidence concerning Operation Pisces was properly admitted. Because the two issues are closely related, I discuss them together.
 
 
 74
 The government introduced evidence concerning an extensive money laundering scheme (Operation Pisces) on the theory that the scheme was part of the conspiracy with which the defendants were charged. I believe, however, that the government has not provided sufficient evidence either to demonstrate that Operation Pisces was part of the overall conspiracy or to establish a connection between the evidence introduced and the defendants' conduct. In order to convict the defendants in this case, the government was required to provide sufficient evidence to demonstrate the existence of a single conspiracy. United States v. Bibbero, 749 F.2d 581, 586 (9th Cir.1994). Although we have recognized that a single conspiracy may involve sub-agreements or subgroups of conspirators, we have held that the government must prove that "the nature of the scheme; the identity of the participants; the quality, frequency, and duration of each conspirator's transactions; and the commonality of time and goals" reveal the existence of a single conspiracy. Id.
 
 
 75
 The memorandum disposition briefly discusses whether there was adequate evidence to show the existence of a single conspiracy, concluding that "conversations and actions link Villabona, Bennett, Martinez, Barona, Harris, and McCarver." The disposition does not, however, analyze whether Operation Pisces was part of the scheme under the multifactor test outlined in Bibbero.
 
 
 76
 Had the majority properly applied the multifactor Bibbero test, it would have concluded that the conspirators have only the most attenuated ties to "Operation Pisces." The only evidence that the government has produced to link this $1.2 million money laundering scheme to the other activities with which the conspirators were charged is that there is a connection between a minor participant in the money-laundering scheme--Leonardo Gomez, who merely delivered some of the money--and Villabona, who the government contends is the leader of the drug-distribution conspiracy which is the basis of the defendants' convictions.
 
 
 77
 This connection, however, is far too attenuated to justify admission of the Operation Pisces evidence as part of the defendants' conspiracy. The only link between the two men is that (1) Gomez went to Villabona's house after one of the deliveries, and (2) Villabona paid Gomez's legal fees and expressed a desire to help him escape from prison after he was caught. Thus, other than the mere fact of association between the leader of the main conspiracy and a minor participant in the Pisces scheme, there appears to be no connection between the conspiracy and the Pisces money laundering scheme. I fail to see how this evidence demonstrates that the schemes are of a similar nature, that the two conspiracies have similar participants and goals, and that the transactions between the two sets of conspirators were frequent and reasonably constant under the standards outlined in Bibbero. Accordingly, I would hold that the evidence concerning Operation Pisces should have been excluded.
 
 
 78
 Moreover, the dearth of evidence establishing a connection between Villabona and Operation Pisces makes clear that a reasonable jury could not have convicted Villabona of being part of the Pisces money laundering scheme. While the evidence suggests the existence of a friendship between Gomez and Villabona, it does not demonstrate that Villabona was aware of and participated in Gomez's scheme. Since a money laundering conviction requires proof of knowledge or intent, see United States v. Montoya, 945 F.2d 1068, 1076 (9th Cir.1991), I cannot concur with the majority's conclusion in Part V that there was sufficient evidence to convict Villabona of money laundering.
 
 
 79
 I also believe that the majority erred in Part IV in holding that the district judge properly admitted the drug ledger seized in connection with Operation Pisces. Our decision in United States v. Enriquez-Estrada, 999 F.2d 1355, 1360 (9th Cir.1993), requires that the government make showings of relevance and authenticity to justify admitting drug ledgers. In this case, the ledger was admitted because (1) Gomez's name was on it (and Gomez and Villabona had a close relationship), and (2) it had the name "Oscar" on it (and Villabona was recorded one year later making a call to someone named "Oscar"). Moreover, even if the Operation Pisces ledger had been properly admitted as relevant evidence, the ledger should have been authenticated in some manner. Id. Here, however, the government admits that it does not know who wrote the ledger and provides no evidence to establish its authenticity. Under such circumstances, the drug ledger should have been excluded from trial.
 
 
 80
 * * *
 
 
 81
 * * *
 
 
 82
 There are two other parts of the disposition with which I cannot concur. First, I believe that there was insufficient evidence to convict Barona of Count 5--aiding and abetting the possession of the 502 kilograms of cocaine that were seized when McCarns and Childress were arrested in Missouri. Although there may be evidence that Barona participated in some of the cocaine deliveries arranged by Villabona, there is no evidence that she was involved in this particular delivery. The majority relies almost entirely upon the fact that Villabona called Barona in a suburb of Detroit on November 16, 1988 regarding a drug shipment to Detroit. I fail to see how this phone call establishes that Barona was involved in the drug shipment that was seized on November 6, ten days earlier, especially when the record makes clear that the phone call did not concern the McCarns and Childress shipment. The only other evidence that the majority cites in support of its holding that the evidence was sufficient--the fact that Barona was a member of the conspiracy--cannot be used to justify convicting her for aiding and abetting this particular delivery.
 
 
 83
 * * *
 
 
 84
 * * *
 
 
 85
 Finally, I disagree with the conclusion in Part X of the memorandum disposition that no prosecutorial misconduct occurred when the prosecutor induced Edward Branch, a defense witness, to take the Fifth Amendment. The majority concludes that the prosecutor did not attempt to influence the witness' decision about whether or not to testify--that is, that he only advised the witness of his legal rights. I disagree.
 
 
 86
 One of the key issues on which Edward Branch apparently testified was the criminal activities of McCarns in Missouri (and the fact that these activities were not connected, as the government claims, to the Villabona conspiracy). This evidence would clearly have had a significant impact upon the jury's decision to convict Barona and Villabona for the Missouri seizure, and it would also have been relevant to the jury's determination of whether the Missouri seizure was part of a single conspiracy and of whether the evidence was erroneously admitted.
 
 
 87
 The prosecutor began his cross-examination in the following manner:
 
 
 88
 Q: Mr. Branch, do you know what immunity means?
 
 
 89
 A: Not really, but I have a little, you know--a little know something [sic] about it.
 
 
 90
 Q: Do you understand that if you come into court and take an oath and admit a crime, you could be prosecuted for that crime?
 
 
 91
 A: Prosecuted for the crime?
 
 
 92
 Q: For the crime that you admit under oath in court.
 
 
 93
 A: I'm in here for the crime.
 
 
 94
 Q: Well, you told us a few minutes ago that you assisted in the manufacturing of P.C.P. in the 1986 time period in Perris, California. Didn't you just testify to that a few minutes ago?
 
 
 95
 A: I take the Fifth.
 
 
 96
 Q: Oh, I take it you don't want to talk about that anymore now that I am asking the questions.
 
 
 97
 Later, the witness stated that he felt that the prosecutor had "threatened" him.
 
 
 98
 I disagree with the majority that the prosecutor was merely informing the defendant of his rights. If that were the case, he could have stopped his inquiry after the third question. Instead of giving the witness a general warning, however, the prosecutor pressed the witness about a specific incident. The specificity of the prosecutor's inquiry clearly indicated to the defendant that the prosecutor could, and would, file charges regarding that statement against the defendant if he continued to testify. Because we held in United States v. Lord, 711 F.2d 887, 892 (9th Cir.1983), that a government attorney may not invoke the possibility of prosecution in order to discourage a witness from testifying, I would require the government either to dismiss the indictment or grant the witness immunity during a new trial.
 
 
 99
 In all other respects, I concur in the memorandum disposition.
 
 
 
 *
 Honorable Jack E. Tanner, United States District Judge, Western District of Washington, sitting by designation