98 F.3d 1347
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
John MALDONADO, Ramon Alberto Leyva Osuna, Jose Arnolda
Landeros, and Jamie Nevarez, Defendants-Appellants.
 Nos. 95-30179, 95-30180, 95-30294 and 95-30295.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 9, 1996.
Decided Oct. 9, 1996.
 
 Before: REAVLEY,* REINHARDT and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 John Maldonado, Ramon Osuna, Jose Landeros, and Jaime Nevarez were convicted on drug conspiracy and other drug charges. Each defendant appeals his conviction or sentence or both. We affirm.
 
 BACKGROUND
 
 3
 Maldonado, Ramon Osuna, Landeros and Nevarez were indicted for conspiracy to distribute marijuana, cocaine and methamphetamine, as well of numerous other drug crimes. Maldonado pleaded guilty to the conspiracy count. The other three defendants proceeded to trial. All were found guilty on the conspiracy count and some of the other counts.
 
 
 4
 Ramon Osuna, Landeros and Nevarez challenge the sufficiency of the evidence presented at trial. In considering a sufficiency challenge, we decide, viewing the evidence in the light most favorable to the government, whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[1] Viewing the evidence in the light most favorable to the government, it proved the following.
 
 
 5
 Andres, Wendy and Pedro Osuna were California suppliers of methamphetamine, marijuana, and cocaine to various drug dealers in the Billings, Montana area. Andres and Pedro are brothers; Wendy is the wife of Andres; appellant Ramon Osuna is a nephew of the brothers. The Montana dealers included Shane Tuttle, Robert Delgado, and defendants Maldonado and Nevarez. Victoria Castro also participated in the drug transactions. Castro would collect money from dealers or customers, and send it to the Osuna brothers in California or give it to Tuttle. Castro, Tuttle, Delgado and Maldonado all testified for the government.
 
 
 6
 Tuttle's involvement in the conspiracy began in 1993, when he started driving vehicles from Montana to California and back for Pedro Osuna in exchange for cash. Drugs were hidden in a secret compartment. The shipments usually consisted of two to four pounds of methamphetamine as well as other drugs. During his early involvement in the conspiracy Tuttle was introduced to coconspirators Castro, Delgado and Maldonado. Tuttle later started making California to Montana shipments for Andres Osuna. These shipments consisted of about ten pounds of methamphetamine and other drugs.
 
 
 7
 On several occasions Tuttle sold or negotiated to sell cocaine to an undercover narcotics agent, Lee Cornell. Cornell purchased approximately one-quarter ounce of cocaine from Tuttle on March 23, at Tuttle's residence. On May 3 Cornell purchased another ounce of cocaine from Tuttle at a parking lot. Tuttle also provided Cornell with a small sample of methamphetamine on that day, with the understanding that more was available for purchase if Cornell liked the sample. On May 19, Cornell met Tuttle at a baseball field and negotiated to purchase half a pound of cocaine. Tuttle went home and returned with the cocaine. This meeting was conducted under wire surveillance, and Cornell and other agents arrested Tuttle. Tuttle agreed to cooperate with the government. His residence was searched and almost one kilogram of cocaine was found. Tuttle stated that his supplier was a man in California named Miguel Rangel, later identified as Andres Osuna. Several conversations between Tuttle and Andres Osuna, Wendy Osuna and Castro were tape-recorded and played to the jury.
 
 
 8
 Appellant Maldonado was another dealer for Andres Osuna. According to Maldonado and his wife, Cindy Maldonado (another cooperating coconspirator and witness) Tuttle and others sent drug proceeds to California by Western Union money transfer or hidden in secret compartments in cars. Tuttle testified that after he grew tired of driving the shipments, Andres Osuna began using Mexican men as couriers. There were usually two couriers so that they could take turns driving. Tuttle testified that one of the cars used was a gold Thunderbird, owned by Andres Osuna, and equipped with secret compartments. He did testify, however, that drivers intentionally were not told that they were carrying drugs, and that he had been instructed never to unload the cars in front of the drivers.
 
 
 9
 Victoria Castro testified that defendants Landeros and Ramon Osuna were drug couriers. Maldonado testified that Landeros was a drug courier for Andres Osuna, and that he had seen Landeros paid $2000 on one occasion. According to Maldonado, Landeros had brought in a shipment of ten pounds of methamphetamine in April 1994. When Landeros was in Billings, Tuttle and Maldonado rented a car for him at the instruction of Andres Osuna, since Osuna did not want the car Landeros had driven from California to be seen around town.
 
 
 10
 Robert Delgado, Maldonado's half brother, offered further evidence of the conspiracy. He testified that he began selling drugs for Andres Osuna in 1993, and that in time regular shipments of cocaine, methamphetamine and marijuana were arriving in Billings. The drugs were divided among Delgado, Tuttle and Maldonado for resale. Andres Osuna instructed Delgado to give a few ounces of methamphetamine to Nevarez from time to time. Delgado had introduced Landeros to Maldonado, identifying him as one of Andres Osuna's drivers.
 
 
 11
 After Tuttle's arrest, agent Cornell learned from a telephone call between Tuttle and Andres Osuna that couriers were bringing in a shipment of drugs on May 19, 1994, to a motel late that evening. That night, appellants Ramon Osuna and Landeros drove the aforementioned Thunderbird from California to Laurel, Montana. They registered at the Locomotive Inn. In another phone call, Andres Osuna told Castro that drugs were coming to Montana and that Tuttle had been "busted or something." She offered to drive to Laurel to pick up the Thunderbird. Osuna told Castro to drive to the Locomotive Inn and "meet those guys." He added that one of the couriers was his nephew, Ramon, and that she would recognize the other courier. In a later phone call Osuna told Castro the couriers were in room 218. She knocked on the door of this room and found defendants Ramon Osuna and Landeros. She testified that she was "absolutely" sure that Ramon Osuna understood why she was picking up the Thunderbird, and that Andres Osuna had told her the couriers would know why she was there. Andres Osuna had told Castro to give the drivers $200 for their return trip. When Castro arrived at the motel Ramon Osuna asked for the $200 and she agreed to pay him when she returned. She recognized Landeros. About a year earlier Pedro Osuna had pointed Landeros out to Castro as one of his couriers. Landeros took her to the Thunderbird and showed Castro how to open the secret compartments where the drugs were located.
 
 
 12
 Castro drove the Thunderbird to Billings. Andres Osuna told her to call Tuttle. Castro told Tuttle the next day that she had the shipment, which included five "huge" bricks of methamphetamine, and the car. Tuttle and Castro arranged to meet at a residence belonging to one of Castro's relatives. Tuttle arrived at the residence wearing an electronic device. Agents intervened and found almost five pounds of methamphetamine as well as some marijuana, at the residence and in the Thunderbird. They also found film in the car which yielded a photograph of Andres Osuna. Castro was arrested at the residence.
 
 
 13
 Castro told the agents where she had left her car and picked up the Thunderbird. The agents then went to the Locomotive Inn and arrested Landeros and Ramon Osuna.
 
 
 14
 On May 8, 1994, Ramon Osuna received from Billings a $3500 Western Union money transfer from one Carmen Cassillas, apparently a fictitious name. In October 1993, Landeros had received from Billings a $4000 money transfer from Delphine Camarillo, who received and delivered drugs for the Osuna brothers.
 
 
 15
 Tuttle received a drug shipment transported in the Thunderbird in May of 1994. He distributed the drugs among himself, Delgado, Maldonado and Nevarez. Nevarez lived near or next door to a house that was the last destination on some of Tuttle's trips from California. When Tuttle was arrested officers found his drug ledger, which contained entries for Nevarez.
 
 
 16
 Pedro Osuna told Castro that Nevarez was one of his dealers, and Castro collected money from Nevarez to send to Osuna. Castro testified that Nevarez lived next to one of Pedro Osuna's "stash houses," a house where drugs were stored. Delgado also delivered methamphetamine to Nevarez at the instruction of Andres Osuna, in quantities of up to half a pound.
 
 
 17
 Maldonado testified that Nevarez was dealing drugs in 1994. At the instruction of Andres Osuna, Maldonado and Delgado had retrieved a bad shipment of drugs from Nevarez, and Maldonado attempted to obtain a replacement shipment of methamphetamine from Nevarez when a shipment for Maldonado was seized when Tuttle was arrested. Maldonado testified that Andres Osuna had put Nevarez in charge of two shipments after Tuttle's arrest. At least four times Maldonado's wife wired money from Nevarez to the Osunas in California. Maldonado testified that Andres Osuna told him that Nevarez owed Osuna approximately $40,000. Osuna's practice was to front drugs--to provide his dealers drugs on consignment, with the understanding that the dealers would sell the drugs and remit payment to Osuna. Cindy Maldonado told Nevarez that Tuttle had been arrested since she knew Nevarez was dealing drugs.
 
 
 18
 Another witness, Josie Miller, testified that Nevarez supplied her with methamphetamine for resale on several occasions, in quantities of up to one pound at a time. She also testified that Nevarez told her that he "had a lot" of cocaine, "or could get ahold of it."
 
 
 19
 On July 4, 1994, Andy Lee Osuna, the teenage son of Andres Osuna, picked up a drug shipment for his father in Billings and delivered it to Nevarez. His mother, Peggy Osuna, had earlier refused to make the delivery after Andres Osuna contacted her. Andres had asked her to deliver the shipment to "Jaime." Phone records were introduced indicating numerous calls between Nevarez's residence and the Osunas in California. The government also introduced several Western Union money transfers (discussed further below), which expert testimony indicated had been signed by Nevarez, as well as correspondence sent from the Osunas' California residence to Nevarez.
 
 DISCUSSION
 I. Sufficiency of Evidence
 
 20
 Osuna, Landeros and Nevarez claim the evidence was insufficient to support their convictions on the conspiracy count and other counts.
 
 A. Osuna
 
 21
 Osuna does not dispute the existence of a conspiracy, but argues that he was not a part of it. "Once a conspiracy has been established, evidence of only a slight connection with it is sufficient to establish a defendant's participation in it."[2]
 
 
 22
 There was sufficient evidence that Ramon Osuna was part of a conspiracy to transport illegal drugs from California to Montana which included as its members Ramon Osuna, the Osuna brothers in California, Tuttle, Castro, Delgado, Maldonado and others. The evidence included testimony and other evidence that (1) Tuttle was informed that the Osunas in California were sending drugs by courier to a motel, and that a shipment was due to arrive on May 19, 1994, (2) Andres Osuna used pairs of Hispanic men to make drug shipments from California to Montana, (3) one of the cars used by the couriers was a gold Thunderbird, (4) Osuna and Landeros drove a gold Thunderbird containing marijuana and methamphetamine from California to Montana on the night of May 19, (5) Osuna had control and custody of the car, having registered it at the Locomotive Inn, and listing its license plate from memory, (6) Castro, an admitted member of the conspiracy, went to pick up the drugs at the Locomotive Inn and was positive that Osuna knew why she was there, (7) Andres Osuna told Castro that his nephew was one of the couriers (8) Andres Osuna asked Castro to pay the drivers $200, and Ramon Osuna immediately asked for the money when Castro arrived at the motel (9) Ramon Osuna received a $3500 Western Union money transfer from Billings, a regular method used by the conspiracy to transfer funds, less than two weeks before his trip to Montana, (10) Landeros, the other driver, had received a $4000 Western Union money transfer from Billings on an earlier occasion, and (11) Tuttle, who had earlier served as a courier for the Osuna brothers, was aware that he was probably transporting drugs although he was not explicitly told so by the Osunas.
 
 
 23
 Ramon Osuna points to evidence in the record that he was on vacation and just along for the ride to Montana, and that couriers were deliberately not told that they were transporting drugs. Given the other evidence described above, however, a rational jury could find beyond a reasonable doubt that he was a member of the conspiracy.
 
 
 24
 From this same evidence a rational jury could also conclude that Osuna was aware of and possessed the drugs in the Thunderbird. Hence, there was also sufficient evidence to support the convictions under counts 2 and 3, substantive counts for possession with intent to distribute methamphetamine and marijuana on or about May 20, 1994. These counts pertained to the drugs that were transported in the Thunderbird by Ramon Osuna and Landeros and later seized.
 
 
 25
 Ramon Osuna also challenges his convictions under counts 10 and 11, for distribution of and possession with intent to distribute cocaine. These convictions were based on Tuttle's delivery of cocaine to Cornell and the subsequent seizure of cocaine at Tuttle's residence on May 19, 1994, the same day that Osuna and Landeros arrived in Montana with their drug shipment. Osuna argues that there was no evidence linking him to this cocaine, in that Tuttle testified that he had never met Osuna, and the evidence was unclear that Osuna was even in Montana at the time the cocaine was seized. This argument fails because under the Pinkerton rule,[3] a defendant is responsible for the criminal acts committed by a coconspirator in furtherance of the conspiracy.[4] The jury was instructed on this rule. Based on the evidence the jury could conclude that Tuttle and Osuna were both part of the same conspiracy, and that Tuttle's possession of and attempt to sell the cocaine were acts in furtherance of the conspiracy.
 
 B. Landeros
 
 26
 Landeros argues that the evidence was insufficient to support his convictions on the conspiracy and other counts. He points to Tuttle's testimony that couriers were intentionally not told that they were carrying drugs. This argument is unpersuasive as to him, since Landeros led Castro to the Thunderbird, showed her how to open the secret compartments containing the drugs, and let her drive away. In addition to this evidence and the evidence described above as to Osuna, (1) Pedro Osuna had told Castro that Landeros was a drug courier, and she recognized him when she arrived at the Locomotive Inn, (2) when Landeros was arrested he was carrying a business card with Delgado's phone number and mobile phone number, and (3) Maldonado testified that Landeros was one of Andres Osuna's drug couriers, that on one occasion Landeros had brought in a shipment of ten pounds of methamphetamine, and that he had seen Landeros paid for his services to the conspiracy.
 
 
 27
 Landeros argues that there was insufficient proof of a single conspiracy as charged in the indictment, as opposed to multiple conspiracies. Whether a single conspiracy was proved is a question of the sufficiency of the evidence.[5] The evidence was sufficient to establish a single conspiracy to regularly ship marijuana, cocaine and methamphetamine from California to Montana, involving a single group of mutually dependent participants--suppliers in California (Andres, Pedro and Peggy Osuna), couriers (Landeros and Ramon Osuna), and dealers in Montana (Maldonado, Delgado, Tuttle and Nevarez), most of whom knew each other. To establish a single conspiracy, "[i]t is sufficient to show that each defendant knew or had a reason to know of the scope of the conspiracy and that each defendant had reason to believe that their own benefits were dependent upon the success of the entire venture."[6]
 
 
 28
 There was also sufficient evidence to support Landeros' conviction on counts 2 and 3, the substantive counts for possession with intent to distribute methamphetamine and marijuana on or about May 20, 1994. These counts concern the drugs actually found in the Thunderbird or at Castro's relative's residence after they were removed from the Thunderbird.
 
 
 29
 As with Osuna, the remaining substantive counts on which Landeros was found guilty concerned cocaine that Tuttle delivered to Agent Cornell or that was seized at Tuttle's residence. For the same reasons explained above as to Osuna, a rational jury could find Landeros guilty of these offenses as committed by a coconspirator in furtherance of the conspiracy.
 
 C. Nevarez
 
 30
 Like Landeros, Jaime Nevarez argues that there were actually several conspiracies. A rational jury could find the existence of a single, overarching conspiracy, as discussed above. Sufficient evidence supports Nevarez's participation in the conspiracy, including evidence that (1) he regularly dealt drugs and had direct contact and dealings with other conspirators, including Tuttle, Delgado, and Maldonado, (2) Pedro Osuna told Castro that Nevarez was one of his dealers, (3) at Andres Osuna's direction Delgado supplied Nevarez with methamphetamine, (4) Tuttle distributed part of a drug shipment to Nevarez, and Tuttle's drug ledgers had references to Nevarez, (4) Maldonado testified that Nevarez was dealing drugs and owed Andres Osuna about $40,000, (5) Cindy Maldonado repeatedly wired money from Nevarez to the Osunas in California, and informed Nevarez of Tuttle's arrest because she knew he was a dealer, (6) Andres Osuna's son made a drug delivery to Nevarez, (7) phone records, correspondence and Western Union records tied him to the Osuna conspiracy, and (8) Josie Miller testified that Nevarez supplied her with methamphetamine, and Nevarez told her he also had access to large quantities of cocaine.
 
 
 31
 As to the remaining counts, count 7 concerned Andy Lee Osuna's drug delivery of cocaine to Nevarez, at the direction of Andres Osuna. Nevarez argues that the evidence showed that he did not want the shipment at first, that there was no evidence identifying the drug as cocaine, and that Andy Lee could not even identify Nevarez at trial. The government offered evidence that Nevarez did eventually accept the shipment. Peggy and Andy Lee Osuna testified that Andres was in the drug trade, that both had been asked to communicate with Andres Osuna about the package by pay phone, and both understood that the package probably contained drugs. Andy Lee identified the package as containing "a bunch of little baggies" of yellowish powdery stuff. There was other evidence that the methamphetamine used by the conspirators was an orange brick-type hard substance, from which the jury could conclude that the drug here was cocaine.
 
 
 32
 At the trial, Andy Lee testified that he wasn't sure Jaime Nevarez was in the courtroom. However, he did testify that he delivered the drugs to "Jaime" and gave the address which was shown to be Nevarez's address through other evidence. His mother also testified that Andy Lee had delivered the shipment to "Jaime." The government introduced a photograph of Nevarez from a lineup that Andy Lee had previously identified as most resembling Jaime. The government further points out that two men were menacing Andy Lee during his testimony, as the district judge explained:
 
 
 33
 [T]he marshall indicated that the two Hispanic gentlemen in the courtroom were making gestures, grabbing their throat, when [Andy Lee Osuna] was on the stand and was asked to identify [Nevarez]. [Andy Lee] was very reluctant and did not identify [Nevarez]. And after I got the note, I looked, and the next time they asked him that question, it was obvious to the court that one of the gentlemen leaned back and again grabbed his throat, and the witness wouldn't testify.
 
 
 34
 Given these circumstances and evidence, we conclude that the evidence was sufficient to convict Nevarez on count 7.
 
 
 35
 The other counts on which Nevarez was convicted involved the drug shipment made by Landeros and Ramon Osuna, and cocaine delivered or possessed by Tuttle. As to these counts, Nevarez is criminally liable as a coconspirator, for the same reasons discussed above as to Osuna and Landeros. These counts involved criminal acts occurring from March 23 through May 20, 1994. Based on the evidence a rational jury could find that Nevarez was a member of the conspiracy throughout this relatively brief period.
 
 II. Denial of Motions to Sever
 
 36
 Osuna, Landeros and Nevarez complain that they should not have been joined in the same indictment and that the district court erred in denying their motions for severance. Joinder of defendants in an indictment is proper under FED.R.CRIM.P. 8(b) if the defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Joinder was proper since all the defendants were alleged to be participants in the same conspiracy made the basis of count 1 of the indictment.
 
 
 37
 Once joinder is proper under Rule 8, the court may nevertheless order a severance under FED.R.CRIM.P. 14 if "it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together...."
 
 
 38
 We review the denial of a motion to sever for abuse of discretion.[7] The general rule is that defendants who are charged together should be tried together.[8] This rule applies to conspiracy cases.[9] The district court properly noted that since the government was proceeding under a Pinkerton theory a severance would result in three separate trials "where essentially the same witnesses would testify to the same factual scenario which underlies the same alleged conspiracy." Further, the court noted that any potential prejudice from a joint trial could be rectified with proper limiting instructions.
 
 
 39
 A party seeking reversal on grounds that the court abused its discretion in denying a motion for severance must prove clear, manifest or undue prejudice from the joint trial, meaning prejudice of such magnitude that the defendant was denied a fair trial.[10]
 
 
 40
 Appellants fail to carry their burden of demonstrating the prejudice required to reverse on this ground. In reviewing the denial of a motion for severance, we frequently consider whether the trial court was careful to instruct the jury in a manner designed to minimize the possibility of prejudice.[11] Here the court gave such instructions.[12] We have also noted that "[t]he best evidence of the jury's ability to compartmentalize the evidence is its failure to convict all defendants on all counts."[13] Here, all three defendants were acquitted on some counts.
 
 
 41
 Finally, we note that this is not a case where a leader was tried along with other minor participants in the conspiracy, or where the alleged wrongdoing or weight of the evidence against the defendants is grossly unequal, thus enhancing the likelihood of a prejudicial spillover effect from the more culpable to the less culpable defendants.[14] From the record it is plain that the leaders in this conspiracy were Andres and Pedro Osuna.
 
 
 42
 III. Admission of Western Union Money Transfer Documents
 
 
 43
 Osuna, Landeros and Nevarez argue that the district court erred in admitting over their objections certain documents pertaining to Western Union money transfers. They claim that these documents were hearsay and were not relevant.
 
 
 44
 The documents consisted of a "to send" document filled out by the sender and a Western Union employee, a "to receive document" filled out by the receiver and a Western Union employee, and related checks and computer generated records documenting the transaction. The receiver of a money transfer is given a checks or checks, which he can then cash on the spot by endorsing the check or checks back to Western Union.
 
 
 45
 These documents were relevant to the prosecution's case. There was evidence that Western Union money transfers were a regular means the conspirators used to transfer funds. Castro, Tuttle, Delgado, Maldonado and Maldonado's wife all testified that drug proceeds were regularly sent to California this way.
 
 
 46
 Appellants complain that the court erred in admitting documents showing the $3500 money transfer to Ramon Osuna on March 8, 1994. These documents were particularly relevant, since they showed that the money transfer originated in Billings, the locus of the conspiracy's drug dealing, and was made to Osuna less than two weeks before he drove the drug-laden Thunderbird to Montana. This evidence directly contradicted Osuna's defense that he was on vacation and just along for the ride to Montana.
 
 
 47
 Although relevant, the question remains whether the documents were inadmissible hearsay. In analyzing the exhibits and their components, we conclude that they either were not hearsay or that they were admissible as business records. To the extent that the documents were offered to prove that money was in fact sent in certain amounts, on certain dates, to and from certain locations, the documents constitute business records, an exception to the hearsay rule.[15] The Western Union chief compliance officer laid the predicate for this exception, by explaining that the records were made contemporaneously with the transactions recorded, by employees with knowledge, and were kept in the regular course of business.[16] Indeed, we conclude that the documents were extremely accurate and reliable in these particulars, since the success of the business depends of the timely and accurate execution of the money transfers.
 
 
 48
 The "to receive" portion of the money transfer that was filled out and signed by Ramon Osuna and his endorsement of the checks issued to him were not hearsay because these portions of the documents constitute admissions.[17] Expert handwriting testimony was offered that Ramon Osuna filled out these portions of the exhibit. The receiver identifies himself as "Ramon Alberto Leyva Osuna," which is Osuna's full name, and the "to send" document identifies the receiver as "Ramon Alberto Leyva." The checks were issued to and endorsed by "Ramon Leyva."
 
 
 49
 Ramon Osuna complains that the "to send" portion of the his $3500 money transfer was from "Carmen Cassillas," who was never identified as a member of the conspiracy. We agree that the portion of the to send document providing the name of the sender does not fall within the business records exception to the hearsay rule, since the business here, Western Union, did not employ a "person with knowledge" under Rule 803(6) who would be expected to know the identity of the sender.[18] However, the identity of the sender is not hearsay, since it was not offered to show the truth of the matter asserted.[19] On the contrary, the government never claimed that Carmen Cassillas was a member of the conspiracy or even existed. Instead, the government maintained, and offered evidence, that the conspirators routinely used aliases or fictitious names, and that, in Tuttle's words, "[t]he only end that mattered was the receiver of the monies. The sender really didn't matter."[20] Expert testimony was offered that Nevarez was the sender of money transfers using sender names other than his own. Western Union's chief compliance officer in effect verified that money could be transferred through a fictitious sender, since no identification is required of the sender, and the receiver, in order to receive his check or cash, need only know the amount sent, the sender's name, and the city and state from where the money was sent, and provide his identification or answer to a test question.
 
 
 50
 A similar analysis applies to the two other exhibits about which Landeros and Nevarez complain. One documented a $3000 money transfer on July 12, 1994 from "Jose Lopez" in Billings to "Judy Miller" in Lakewood, California. The other documented a $900 money transfer on July 7, 1994 from "Jose Cano" in Billings to "Raymond Beeson." The government offered expert handwriting testimony to show that portions of the "to send" documents were written by Jose Nevarez. The evidence was relevant to show that, after the arrest of Tuttle and Castro, Nevarez apparently assumed some responsibility for transferring funds from Billings. These payments were within eight days of Andy Lee Osuna's delivery of drugs from Andres Osuna to Nevarez. The evidence was also relevant as further proof that the conspirators used fictitious names when sending money in this manner. The documents were admissible as admissions by Nevarez, and as business records, for the reasons given above as to Ramon Osuna's $3500 money transfer.[21]
 
 IV. Sentencing
 
 51
 All four defendants claim error by the district court in sentencing.
 
 A. Maldonado
 
 52
 Maldonado pleaded guilty to the count 1 conspiracy count pursuant to a plea agreement. The probation officer recommended a sentence of 262-327 months. The court imposed a sentence of 210 months. The plea agreement provides:
 
 
 53
 6. Defendant will plead guilty because he is in fact guilty of the charge contained in Count I of the Indictment.
 
 
 54
 12. John Maldonado agrees to cooperate fully and give a full and complete statement regarding all of his and others['] illegal activities, past and present.... However, the United States agrees not to use any information provided by the defendant pursuant to this agreement to charge additional offenses or seek additional enhancements or penalties beyond what has been charged in the current indictment, or is currently under investigation for a Superseding Indictment.
 
 
 55
 14. At sentencing the government will recommend a sentence of 240 months....
 
 
 56
 15. In regard to the application of guideline sentencing for the offense(s) to which the defendant will plead guilty, it is stipulated and agreed by the parties that the sentencing guideline calculation--based upon his criminal history, the amount of controlled substances moved during the conspiracy and potential enhancements--far exceeds the 240 months bargained for herein, although the exact calculation is not known.
 
 
 57
 17. Provided that the sentence the Court imposes on the defendant is in conformity with the government's recommendation, the defendant knowingly and expressly waives the right to contest either the conviction or the sentence in any post-conviction proceeding....
 
 
 58
 At the sentencing hearing counsel for Maldonado argued that despite the plea agreement Maldonado should be able to object to the presentence report, and in particular the enhancement for use of a gun and the quantity of drugs involved. The court gave Maldonado the opportunity to withdraw the guilty plea, and specifically pointed out that Maldonado's right to appeal is waived under the agreement so long as the sentence was set at 240 months. Maldonado agreed to abide by the terms of the plea agreement.
 
 
 59
 Maldonado argues in his brief that the district court erred in calculating the drug quantity attributable to him, and should have conducted "a fact-finding process when the Defendant challenged the attributions of drug quantities to him at the time of sentencing." For example, he argues that there was more than one conspiracy.
 
 
 60
 Maldonado also claims that the court erred in adding a two-point enhancement for use of a firearm, when the information regarding use of a firearm was obtained from Maldonado's own debriefing after he signed the plea agreement. He complains that the government then added a reference to his use of a firearm in a superseding indictment, and that the probation officer then used this allegation to recommend a two-point upward adjustment to his offense level for use of a firearm.[22] The superseding indictment under which the other appellants were tried did reference Maldonado's use of a handgun, in its list of overt acts in furtherance of the count 1 conspiracy. Maldonado also testified to the firearm incident at the trial of the other three appellants.
 
 
 61
 An express waiver of the right to appeal in a negotiated plea agreement is valid if knowingly and voluntarily made, and if the sentence actually imposed does not exceed the cap contemplated in the agreement.[23] The agreement here had a cap of 240 months, and the court sentenced Maldonado to 210 months. Maldonado makes no argument that his waiver of his right to appeal in paragraph 17 of the plea agreement was not knowing and voluntary. Because (1) Maldonado expressly agreed that "the sentencing guideline calculation--based upon his criminal history, the amount of controlled substances moved during the conspiracy and potential enhancements--far exceeds the 240 months bargained for herein," (2) the court imposed a sentence below the cap stipulated in the agreement, and (3) Maldonado expressly waived his right to appeal a sentence below 240 months, his challenge to his sentence must be rejected by this court.
 
 
 62
 The only exception that might apply here is that we can review the sentence where the defendant claims that the government breached the plea agreement.[24] Maldonado suggests that the government breached the plea agreement because it added the reference to his use of a firearm in the superseding indictment that followed his debriefing.
 
 
 63
 Maldonado does not establish a breach of the agreement. A plea agreement is contractual in nature, and is construed to mean what the parties reasonably understood to be the terms of the agreement.[25] Maldonado negotiated the agreement with his attorney and the United States Attorney's office and reaffirmed it when the trial court gave him the opportunity to withdraw at the time of the sentencing. Furthermore, there is no evidence that the United States Attorney's office urged or sought a sentencing enhancement against Maldonado, from the court or the probation officer, for Maldonado's use of a firearm.[26]
 
 B. Osuna
 
 64
 Osuna complains that the district court erred in not applying the "safety valve" provision of U.S.S.G. § 5C1.2. This Guideline, derived from 18 U.S.C. § 3553(f), provides that the court "shall impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum sentence" if five criteria are met. The fifth criterion is that
 
 
 65
 not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.
 
 
 66
 The presentence report calculated the base offense level at 36, which, along with a criminal history category of I, resulted in a sentencing range of 188-235 months. The district court departed from this range, determining a total offense level of 32, on grounds that Osuna "was a minimal participant in the overall conspiracy; the original guideline application overrepresented defendant's criminal conduct; and defendant's criminal conduct in this case was aberrant behavior." The court imposed a sentence of 121 months, at the bottom of the sentencing range given this offense level and criminal history category, and just above the statutory minimum sentence of ten years.[27]
 
 
 67
 The court rejected the request for application of the safety valve provision, finding that Osuna had not been truthful with the government as required under this Guideline. Because the sentence was above the mandatory minimum, even after the downward departure, this request could not help Osuna.
 
 
 68
 Furthermore the court's finding is not clearly erroneous. From the above discussion of the sufficiency of the evidence, the jury and the court had ample grounds for rejecting Osuna's claim that he was just along for the ride or was on vacation. At the sentencing phase he continued to maintain his complete innocence, stating in a letter to the probation officer, and orally to the court at the sentencing hearing, that he was in the United States to visit his girlfriend, that he knew nothing about his relatives in California, that he was not guilty of the crimes for which he was convicted, and that "I know absolutely nothing."
 
 C. Landeros
 
 69
 Landeros argues that the court erred in assigning to him a drug quantity equal to the total of all drugs seized by the government, including cocaine in the possession of Tuttle.
 
 
 70
 The presentence report calculated the drug quantity based on tests performed by a DEA chemist on the seized drugs. The report converted all the drugs (after adjusting for purity levels) to a marijuana equivalent of 15,372.84 kilograms of marijuana.[28] Landeros does not challenge the accuracy of the drug testing; instead he challenges the court's decision to attribute all of the seized drugs to him for sentencing purposes, and its failure to make specific fact findings as to its basis for assigning all the seized drugs to him.
 
 
 71
 Under U.S.S.G. § 1B1.3, in cases of jointly undertaken criminal activity, including conspiracy cases, the offense level calculation should be based on "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." Therefore, we have held that attributing all of the drugs tied to a conspiracy to a single defendant for sentencing purposes requires a finding by the district court that all drugs were associated with conduct that was reasonably foreseeable from the standpoint of that defendant.[29]
 
 
 72
 We have carefully reviewed the record on this issue. The district court expressly adopted the factual findings of the presentence report. The presentence calculation of drug quantity led to a offense level of 38, 36 points based on the drug quantity, plus a two-point upward adjustment due to the proximity of the drugs to an elementary school.[30] At the sentencing hearing, the court noted a sentencing range of 235-293 months based on a total offense level of 38 and a criminal history category of I. The court then sentenced Landeros to 235 months, the bottom of the guideline range. The court reasoned that, even though "the fact situation clearly puts you into the conspiracy," it would enter a sentence at the low end of the sentencing range because Landeros did not have a prior criminal record.
 
 
 73
 As was done here, a court may adopt the findings of the probation officer in the presentence report if supported by the evidence.[31] An error in calculating drug quantity does not require a remand if the error is harmless.[32] Of the drugs attributed to Landeros, all were drugs traced to the Thunderbird he drove to Montana, with the exception of cocaine and a small quantity of methamphetamine involving Tuttle. The methamphetamine alone from the Thunderbird equates to 15,131.73 kilograms of marijuana, of the 15,372.84 kilograms found by the probation officer. A base level offense of 36 covers 10,000 to 30,000 kilograms of marijuana.[33] Even if it were error to include Tuttle's drugs in the drug quantity calculation, we conclude that "the district court would have imposed the same sentence absent the erroneous factor,"[34] given that (1) the court adopted a base offense level of 36 based on the presentence report, (2) the base offense level does not change even if Tuttle's drugs are excluded, (3) the court sentenced Landeros at the very bottom of the guideline range, and (4) there is nothing in the record indicating that the court was influenced by the relatively minor amounts of drugs directly linked to Tuttle.
 
 D. Nevarez
 
 74
 Like Landeros, Nevarez argues that the court erred in attributing all of the seized drugs to him for sentencing purposes, and failing to make specific fact findings as to its basis for assigning all the seized drugs to him.
 
 
 75
 As with Landeros, the district court adopted the factual findings of Nevarez's presentence report, which also recommended a total offense level of 38, corresponding to base offense level of 36 based on the total amount of drugs seized, and a two-point upward adjustment because of the proximity of the drugs to a school. At the sentencing hearing the court expressly found that Nevarez was "heavily involved in the conspiracy, [was] very definitely tied into the conspiracy through many different factors" and was "an integral part of the conspiracy." The court sentenced Nevarez to 270 months, within the guideline range of 235-293 months for an offense level of 38 and a criminal history category of I. We conclude that the court's findings are sufficiently specific to support the sentence, since we have held that a court may attribute to a conspirator all of drugs involved in the conspiracy where the conspirator "was heavily involved in and intimately familiar with the ... drug distribution conspiracy."[35] As detailed above in the discussion of sufficiency of evidence, the record supports the district court's finding of Nevarez's heavy involvement in the conspiracy. Accordingly the court did not err in attributing all of the drugs seized to him for sentencing purposes.
 
 CONCLUSION
 
 76
 For the foregoing reasons, the convictions and sentences are AFFIRMED.
 
 
 
 *
 Honorable Thomas M. Reavley, Senior United States Circuit Judge for the United States Court of Appeals, Fifth Circuit, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 United States v. Arias-Villanueva, 998 F.2d 1491, 1503 (9th Cir.), cert. denied, 510 U.S. 937, 1001 (1993)
 
 
 [2]
 United States v. Castaneda, 16 F.3d 1504, 1510 (9th Cir.1994)
 
 
 [3]
 Pinkerton v. United States, 328 U.S. 640, 646-47 (1946)
 
 
 [4]
 United States v. Hegwood, 977 F.2d 492, 498 (9th Cir.1992), cert. denied, 508 U.S. 913 (1993); United States v. Crespo de Llano, 838 F.2d 1006, 1019 (9th Cir.1987)
 
 
 [5]
 United States v. Begay, 42 F.3d 486, 501 (9th Cir.1994), cert. denied, 116 S.Ct. 93 (1995)
 
 
 [6]
 United States v. Kostoff, 585 F.2d 378, 380 (9th Cir.1978)
 
 
 [7]
 United States v. Buena-Lopez, 987 F.2d 657, 660 (9th Cir.1993)
 
 
 [8]
 Id
 
 
 [9]
 Id
 
 
 [10]
 United States v. Vasquez-Velasco, 15 F.3d 833, 845-46 (9th Cir.1994)
 
 
 [11]
 E.g. Vasquez-Velasco, 15 F.3d at 846; United States v. Baker, 10 F.3d 1374, 1387 (9th Cir.1993), cert. denied, 115 S.Ct. 330 (1994); Buena-Lopez, 987 F.2d at 660
 
 
 [12]
 The court gave numerous instructions for this purpose to the jury, including the following instruction prior to the government's rebuttal case: "In certain instances, evidence may be admitted only concerning a particular party or only for a particular purpose and not generally against all parties or for all purposes. You're about to hear the testimony of several rebuttal witnesses. This rebuttal testimony is admitted only against Mr. Nevarez. This testimony is admitted solely for rebutting the evidence presented in Mr. Nevarez's case in chief. It is not to be considered as evidence against Mr. Landeros and/or Mr. Leyva Osuna." The court also included the following instructions in the final charge: Instruction No. 8 ("You should consider evidence about the acts, statements, and intentions of others, or evidence about other acts of the defendants, only as they relate to this charge against each defendant."); Instruction No. 10 ("You must decide the case of each defendant on each crime charged against each defendant separately. Your verdict on any count as to any defendant should not control your verdict on any other count or as to any other defendant."); Instruction No. 33 ("[I]f you find that any defendant was not a member of the charged conspiracy, then you must find that defendant not guilty, even though that defendant may have been a member of some other conspiracy."); Instruction No. 38 ("Evidence has been received in this case that certain persons, who are alleged in Count I of the indictment to be co-conspirators of defendant, have done or said things during the existence or life of the alleged conspiracy in order to further or advance its goal(s).... Since these acts may have been performed and these statements may have been made outside the presence of the defendant and even done or said without the defendant's knowledge, these acts or statements should be examined with particular care by you before considering them against the defendant who did not do the particular act or make the particular statement.")
 
 
 [13]
 Baker, 10 F.3d at 1387 (quoting United States v. Unruh, 855 F.2d 1363, 1374 (9th Cir.1987), cert. denied, 488 U.S. 974 (1988))
 
 
 [14]
 See Vasquez-Velasco, 15 F.3d at 846 ("Severance has been granted when the charges brought against the defendants or the weight of the evidence supporting each charge is wholly disparate or disproportionate.")
 
 
 [15]
 FED.R.EVID. 803(6)
 
 
 [16]
 Id.; See also United States v. Cestnik, 36 F.3d 904, 907 (10th Cir.1994), cert. denied, 115 S.Ct. 1156 (1995) (holding that Western Union money transfer forms are business records insofar as they are offered to prove date and amount of transfer)
 
 
 [17]
 FED.R.EVID. 801(d)(2)(A); see also United States v. Johnson, 28 F.3d 1487, 1498-99 (8th Cir.1994), cert. denied, 115 S.Ct. 1263 (1995) (holding that portions of Western Union money transfer documents completed by the defendants themselves are admissions of party-opponents and therefore are not hearsay)
 
 
 [18]
 See Cestnik, 36 F.3d at 908 (senders' names on Western Union money transfer documents are not admissible under business records exception to hearsay rule); Johnson, 28 F.3d at 1498 (same)
 
 
 [19]
 " 'Hearsay' is a statement ... offered in evidence to prove the truth of the matter asserted." FED.R.EVID. 801(c)
 
 
 [20]
 See Cestnik, 36 F.3d at 908-09 (senders' names on Western Union money transfer documents, which government contended were fictitious names used by defendant, were not hearsay because they were not offered for the truth of the matter asserted.)
 
 
 [21]
 Because the records were properly admitted for the above stated reasons, we need not reach the government's alternative argument that the records were admissible as statements "by a coconspirator of a party during the course and in furtherance of the conspiracy" under FED.R.EVID. 801(d)(2)(E)
 
 
 [22]
 See U.S.S.G. § 2D1.1(b)(1)
 
 
 [23]
 United States v. DeSantiago-Martinez, 38 F.3d 394, 395 (9th Cir.1992), cert. denied, 115 S.Ct. 939 (1995); United States v. Bolinger, 940 F.2d 478, 480 (9th Cir.1991)
 
 
 [24]
 United States v. Gonzalez, 981 F.2d 1037, 1038 (9th Cir.1992)
 
 
 [25]
 Unites States v. Floyd, 1 F.3d 867, 870 (9th Cir.1993)
 
 
 [26]
 See Unites States v. Gaines, 888 F.2d 1122, 1124 n. 3 (6th Cir.1989) ("We also reject the defendant's assertion that the probation officer is bound by the non-binding stipulations in the plea bargain agreement. A probation officer operates under the supervision of the court, not the U.S. Attorney.... As a functionary of the court, the probation officer is no more bound by the stipulations than is the court itself."); United States v. Shows, 797 F.Supp. 539, 541 (S.D.Miss.1992) ("The United States Probation Office is not 'the government' in the context of the criminal prosecution. The United States Attorney and the federal investigative agency which developed the case against the Defendant are 'the government'.... The Court concludes that United States probation officer is not 'the government' as meant in the plea bargain in this case and cannot therefore be charged with breaching the plea agreement...."), affirmed, 988 F.2d 1211 (5th Cir.1993)
 
 
 [27]
 21 U.S.C. § 841(b)(1)(A)
 28 U.S.S.G. § 2D1.1 provides drug equivalency tables for making such calculations.
 
 
 [29]
 United States v. Castaneda, 9 F.3d 761, 769-770 (9th Cir.1993), cert. denied, 114 S.Ct. 1564 (1994); United States v. Conkins, 9 F.3d 1377, 1386-87 (9th Cir.1993), United States v. Navarro, 979 F.2d 786, 788-89 (9th Cir.1992)
 
 
 [30]
 See U.S.S.G. § 2D1.2(a)(1). Landeros does not challenge this two-point upward adjustment
 
 
 [31]
 United States v. Hanoum, 33 F.3d 1128, 1132 (9th Cir.1994), cert. denied, 115 S.Ct. 1702 (1995); Navarro, 979 F.2d at 789
 
 
 [32]
 Castaneda, 9 F.3d at 770; see also Williams v. United States, 503 U.S. 193, 203 (1992) (cited by Castaneda and holding that, in reviewing a downward departure, "[i]f the party defending the sentence persuades the court of appeals that the district court would have imposed the same sentence absent the erroneous factor, then a remand is not required....")
 33 U.S.S.G. § 2D1.1(c)(2).
 
 
 [34]
 Williams, 503 U.S. at 203
 
 
 [35]
 United States v. Bracy, 67 F.3d 1421, 1435 (9th Cir.1995)